IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00982-KLM

ESTATE OF JASON WATERHOUSE, through its personal representative, Heather Lopez, and
AMBER WATERHOUSE, daughter of Jason Waterhouse, deceased,

      Plaintiffs,

v.

CITY OF LAKEWOOD, COLORADO, a municipality, and
SERGEANT MARC DIREZZA, in his individual capacity,

      Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendant Marc DiRezza's ("DiRezza") **Motion to Dismiss** [#28] ("DiRezza's Motion") and Defendant City of Lakewood's ("Lakewood") **Motion to Dismiss** [#29] ("Lakewood's Motion") (collectively, the "Motions"). Plaintiffs filed Responses [#30, #31] in opposition to the Motions [#28, #29], and Defendants filed Replies [#32, #33]. The Court has reviewed the briefs, the case file, and the applicable law, and is sufficiently advised in the premises.[1] For the reasons set forth below, Defendant DiRezza's Motion [#28] is **DENIED** and Defendant Lakewood's Motion [#29] is **GRANTED**.

**I. Background[2]**

_____

[1] This case has been referred to the undersigned pursuant to 28 U.S.C. § 636(c). *See* [#14].

[2] For purposes of resolving the Motions [#28, #29], the Court accepts as true all well-pled, as opposed to conclusory, allegations made in Plaintiffs' Amended Complaint [#25]. *See Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citation omitted).

On December 19, 2019, Lakewood Police Department officers (the "Agents") responded to a call by Heather Lopez ("Lopez") regarding her brother, Jason Waterhouse ("Waterhouse"). *Am. Compl.* [#25] ¶¶ 1-2.  Mr. Waterhouse had been living with Ms. Lopez since bonding out of jail in early December 2019.  *Id.* ¶ 16.  While staying with Ms. Lopez, Mr. Waterhouse experienced mental health problems, including a lack of sleep, paranoia, and delusions.  *Id.* ¶¶ 20-22.  He consumed alcohol and may have used methamphetamine.  *Id.* ¶ 20.  On December 19, 2019, convinced that "people were coming after him to harm him," *id.* ¶ 21, Mr. Waterhouse began barricading himself in a room underneath the stairs in Ms. Lopez's basement, *id.* ¶¶ 23-24.  Unable to convince Mr. Waterhouse to exit the basement, Ms. Lopez called the police.  *Id.* ¶ 29.

When the Agents arrived, Ms. Lopez explained that Mr. Waterhouse suffered from mental health problems and was barricading himself in her basement using a hammer and drywall.  *Id.* ¶ 35.  Ms. Lopez emphasized to the Agents that she did not feel threatened by Mr. Waterhouse.  *Id.* ¶¶ 39-44.  Ms. Lopez advised the Agents that she wanted to get Mr. Waterhouse out of the basement and ensure that he received mental health treatment.  *Id.* ¶¶ 47-49.  Plaintiffs allege that, based on Mr. Waterhouse's mental health and the fact that he had not threatened anyone, the Agents determined that non-lethal ("less lethal") measures—such as pepper spray, Tasers, and non-lethal ammunition—would be appropriate.  *Id.* ¶¶ 53-55, 61.  The Agents informed dispatch that there were no guns in the house, that Mr. Waterhouse had not threatened anyone, and that Mr. Waterhouse had only damaged property.  *Id.* ¶¶ 64-67, 70.  More Agents subsequently arrived, and approximately twenty-six minutes after the first Agents arrived,

Agent Geoffrey Hagerman ("Hagerman") "advised dispatch that there were 'sufficient agents on scene.'"  *Id.* ¶¶ 62, 71.

Led by Sergeant Eric Ebeling ("Ebeling"), the Agents devised a plan to persuade Mr. Waterhouse to exit the basement.  *Id.* ¶¶ 73, 76.  Three Agents (the "Outdoor Agents"), including Agent Zachary Cook ("Cook"), would wait outside near the back door and try to observe Mr. Waterhouse through the rear basement windows.  *Id.* ¶¶ 73-75.  The remaining seven Agents would go inside (the "Indoor Agents") to negotiate with Mr. Waterhouse.  *Id.* ¶¶ 73, 77.  Plaintiffs allege that both groups of Agents understood that this was a "non-lethal plan," according to which they would use pepper spray, Tasers, or "less lethal" rounds if Mr. Waterhouse resisted.  *See id.* ¶¶ 85-90.  The Indoor Agents entered the house and began speaking with Mr. Waterhouse from the top of the basement stairs.  *Id.* ¶ 91.  Despite Sergeant Ebeling's requests, Mr. Waterhouse refused to come out from behind his barricade in the basement room.  *Id.* ¶¶ 107-08.  Plaintiffs allege that Sergeant Ebeling offered Mr. Waterhouse a cigarette if he would come upstairs, then threatened to release a dog from the K-9 unit into the basement.  *Id.* ¶¶ 114-16.  Both of these efforts proved unsuccessful.  *Id.* ¶ 116.

During this negotiation, Defendant DiRezza, another Agent, arrived on scene.  *Id.* ¶ 105.  Plaintiffs allege that Defendant DiRezza proceeded to Ms. Lopez's house even though he knew there were sufficient officers present, the house was outside his patrol area, and another sergeant—Sergeant Ebeling—was on scene.  *Id.* ¶¶ 101-04.  Defendant DiRezza joined the Indoor Agents and suggested to Sergeant Ebeling that the Agents fire pepper spray projectiles ("pepper balls") into the basement.  *Id.* ¶¶ 117, 134.

Plaintiffs allege that, based on this conversation, Sergeant Ebeling ordered the Outdoor Agents to fire pepper balls through a basement window.  *Id.* ¶¶ 120-23.

Sometime around the time the pepper balls were used, the Agents began to smell smoke.  *Id.* ¶ 124.  It is unclear whether the Agents smelled smoke immediately before or at the same time as the use of the pepper balls.  *See id.* ¶¶ 126-130.  As the smoke thickened, Plaintiffs allege that "[t]he [Indoor] Agents were worried because it seemed like a fire in the basement was growing."  *Id.* ¶ 136.  The Indoor Agents, including Defendant DiRezza, elected to go into the basement to attempt to get Mr. Waterhouse upstairs.  *Id.* ¶ 137.  In this group of seven Agents, only Sergeant Ebeling and Defendant DiRezza carried their duty weapons—pistols with live rounds.  *Id.* ¶ 140.

Once in the basement, the Indoor Agents repeatedly attempted to open the door to the basement room in which Mr. Waterhouse had barricaded himself.  *Id.* ¶ 143.  Each time they opened the door, however, Mr. Waterhouse would slam it shut.  *Id.*  The Agents could see a fire in the room behind Mr. Waterhouse.  *Id.* ¶ 145.  Additionally, "it appeared to some Agents that [Mr. Waterhouse] may have had a four-foot stick that looked sort of like a shower rod."  *Id.* ¶ 144.  In light of the increasing smoke, fire danger, and irritating chemicals from the pepper balls, Sergeant Ebeling ordered the Indoor Agents to evacuate the basement and return up the stairs.  *Id.* ¶¶ 146-149.

Plaintiffs base their allegations of the ensuing events on the account of Agent Cook, who observed from outside a basement window as the Indoor Agents retreated up the basement stairs.  *See id.* ¶¶ 154-63.  As the last of the Indoor Agents were exiting the basement, Mr. Waterhouse ran out of the back room.  *Id.* ¶ 157.  The only two Agents left in the basement at that time were Agent Chase Williams ("Williams") and Defendant

DiRezza.  *Id.* ¶ 156.  Defendant DiRezza was roughly in the middle of the room.  *Id.* ¶ 158.  Agent Williams, armed with a non-lethal shotgun, was between Defendant DiRezza and the bottom of the stairs.  *Id.* ¶ 159.  According to Agent Cook, Mr. Waterhouse had nothing in his hands and appeared to be "just trying to run up the stairs at that point."  *Id.* ¶¶ 162-63.  Mr. Waterhouse ran toward Agent Williams and the bottom of the stairs.  *Id.* ¶ 170.  Agent Williams, who could not immediately see Mr. Waterhouse's right hand, shot Mr. Waterhouse "at close range" with two non-lethal "super sock" rounds from his shotgun. *Id.* ¶¶ 170-72.  Mr. Waterhouse "stopped running," "crumpled over[,] and turned to his left" as he was hit by the super sock rounds.  *Id.* ¶¶ 173-74.  Plaintiffs allege that, as Mr. Waterhouse fell, Defendant DiRezza "fired his pistol and shot Mr. Waterhouse in the back."  *Id.* ¶ 176.  Plaintiffs further allege that Defendant DiRezza did not issue any commands or warnings to Mr. Waterhouse prior to firing his pistol.  *Id.* ¶¶ 179-81.  Mr. Waterhouse allegedly died within moments of being shot.  *Id.* ¶ 188.

Near the top of the basement stairs, Agent Hagerman heard the shots and turned to see Mr. Waterhouse lying on the floor.  *Id.* ¶¶ 182-83.  Agents Hagerman and Williams helped Defendant DiRezza carry Mr. Waterhouse out of the basement.  *Id.* ¶ 184.  According to Agent Hagerman, Mr. Waterhouse felt like "dead weight."  *Id.* ¶ 187.  Plaintiffs allege that the Agents "dragged Mr. Waterhouse up the stairs and threw him out of the front door" into the yard, where they handcuffed him.  *Id.* ¶¶ 191-94.

Plaintiffs allege that Defendant DiRezza made several false statements to investigators about the incident.  *Id.* ¶ 212.  First, Plaintiffs allege that Defendant DiRezza said Mr. Waterhouse "ran straight at him" out of the basement room, holding a "stick that was 4-to-5 feet long" with both hands.  *Id.* ¶¶ 196, 198, 203.  This contradicts the accounts

of Agents Cook, Williams, and Hagerman.   None of these Agents reported a stick or anything else in Mr. Waterhouse's hands during this time frame.  *Id.* ¶¶ 201-03.  Plaintiffs also assert that this statement contradicts Agent Williams' statement that Mr. Waterhouse was running toward Agent Williams, as the Agent stood near the bottom of the stairs, rather than Defendant DiRezza.  *Id.* ¶ 205.  Third, Defendant DiRezza allegedly stated that "Mr. Waterhouse swung the stick at him and that it grazed Defendant DiRezza's wrists." *Id.* ¶ 206.  Plaintiffs note Agent Cook's observation that Mr. Waterhouse appeared to be "just trying to run upstairs at that point."  *Id.* ¶ 208.  Finally, Defendant DiRezza allegedly "told investigators that he shot Mr. Waterhouse 'center mass' in his front torso as Mr. Waterhouse ran at him."  *Id.* ¶ 209.  Plaintiffs allege that an autopsy found Mr. Waterhouse was shot in the back.  *Id.* ¶ 211.  Plaintiffs further allege that "Defendant DiRezza constructed his own story to cover up his killing of [Mr.] Waterhouse." *Id.* ¶ 213.

Plaintiffs bring three claims. First, Plaintiff Estate of Jason Waterhouse (the "Estate") brings a Fourth Amendment excessive force claim against Defendant DiRezza pursuant to 42 U.S.C. § 1983.  *See id.* ¶ 251.  Second, both Plaintiffs bring another § 1983 claim against Defendant Lakewood based on failure to properly train or supervise that resulted in a policy or custom of excessive force in connection with encounters between Defendant Lakewood's Agents and individuals suffering from mental illness. *See id.* ¶ 266.  Third, Plaintiff Amber Waterhouse ("Ms. Waterhouse"), Mr. Waterhouse's daughter, brings a state tort claim against Defendant DiRezza for battery causing wrongful death under Colo. Rev. Stat. §§ 13-21-201 to -204.  *See id.* ¶ 303.  Defendant Lakewood is sued as a municipality, and Defendant DiRezza is sued in his individual capacity.  *Id.* at 1.

In the present Motions [#28, #29], Defendants argue that all three of Plaintiffs' claims should be dismissed.  *See DiRezza's Motion* [#28] at 1; *Lakewood's Motion* [#29] at 2.  Defendant DiRezza argues that Plaintiffs fail to state an excessive force claim under Rule 12(b)(6) because Defendant DiRezza is entitled to qualified immunity.  *DiRezza's Motion* [#28] at 14.  Regarding the failure to train claim, Defendant Lakewood argues that Plaintiffs fail to state a claim because they do not adequately allege that a "policy, procedure, custom, or practice" of Defendant Lakewood served as the "moving force behind the alleged constitutional violation."  *Lakewood's Motion* [#29] at 2.  As for Plaintiffs' state tort claim, Defendant DiRezza argues that Plaintiffs' claim fails to adequately allege that Defendant DiRezza's conduct was sufficiently "willful and wanton" to exempt the claim from sovereign immunity granted under the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. §§ 24-10-101 to -120.  *DiRezza's Motion* [#28] at 18.

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted").  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).  To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a

complaint must contain enough allegations of fact to state a claim for relief that is plausible on its face." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations.") (quoting *Twombly*, 550 U.S. at 570)).

  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (brackets in original; internal quotation marks omitted). That said, "[s]peculative facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"; the 12(b)(6) standard does not "require that the complaint include all facts necessary to carry the plaintiff's burden." *Khalik v. United Airlines*, 671 F.3d 1188, 1190 (10th Cir. 2012). To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a factual allegation has been stated, "but it has not show[n] [ ] that the pleader is entitled to relief," as required by Fed. R. Civ. P. 8(a). *Iqbal*, 556 U.S. at 679 (second brackets added; citation and internal quotation marks omitted).

### III.  Analysis

**A.**    **Excessive Force Claim Against Defendant DiRezza**

Defendant DiRezza argues that he is entitled to qualified immunity with respect to the Estate's Fourth Amendment excessive force claim.  *Motion* [#28] at 14.  The doctrine of qualified immunity "shields government officials performing discretionary functions from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a defendant asserts qualified immunity, the burden shifts to the plaintiff to satisfy a strict two-part test demonstrating that the defense is not applicable.  *Fisher v. City of Las Cruces*, 584 F.3d 888, 893 (10th Cir. 2009).  First, viewing the allegations in the light most favorable to the plaintiff, the plaintiff must provide evidence demonstrating that a defendant's actions violated a constitutional or statutory right.  *Id.*  Second, "the plaintiff must show that the right was clearly established at the time of the alleged unlawful activity."  *Id.*  However, raising a qualified immunity defense in a Rule 12(b)(6) motion "subjects the defendant to a more challenging standard of review than would apply on summary judgment."  *Sayed v. Virginia*, 744 F. App'x 542, 545-46 (10th Cir. 2018) (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)).  "A plaintiff need only allege enough factual matter to state a claim that is plausible on its face and provide fair notice to a defendant."  *Id.* (internal quotation marks omitted).

**1.**    **Constitutional Violation**

"[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."

*Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Accordingly, when determining whether Defendant DiRezza violated Mr. Waterhouse's constitutional rights, the excessive force claim is "governed by the Fourth Amendment's objective reasonableness standard." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010).  "The precise question asked in an excessive force case is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)) (internal quotation marks omitted).  The Court's "review of a Fourth Amendment excessive force claim looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment."  *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020) (citation omitted).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 1135 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)); *see also City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015) ("The Constitution is not blind to the fact that police officers are often forced to make split-second judgments.") (internal quotation marks omitted).  "Assessing the reasonableness of the force 'requires careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Emmett*, 973 F.3d at 1135 (quoting *Graham*, 490 U.S. at 396).

When evaluating the use of deadly force, the three *Graham* factors are applied to "help structure this inquiry." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 762 (10th Cir. 2021). However, "[a]lthough the first and third [*Graham*] factors can be particularly significant in a specific case, the second factor—whether there is an immediate threat to safety—'is undoubtedly the most important . . . factor in determining the objective reasonableness of an officer's use of force.'" *Est. of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020) (quoting *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017)). The importance of the second *Graham* factor is "particularly true in a deadly force case, because deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Reavis ex rel. Est. of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (citation and internal quotation marks omitted); *see also Est. of Valverde*, 967 F.3d at 1061 ("[I]t would be insignificant whether [a suspect] was about to be arrested for a minor crime . . . if it reasonably appeared that he was about to shoot a gun at an officer from close range."). The Court therefore considers all three *Graham* factors, but places particular weight on whether Mr. Waterhouse posed an immediate threat to Defendant DiRezza or the other Agents.

### a. Severity of Crime

When contemplating the severity of a crime under the first *Graham* factor, the felony or misdemeanor status of the crime is an essential consideration. *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007). Courts may additionally consider whether the act was accompanied by violence. *Est. of Ronquillo by & through Est. of Sanchez v. City & Cnty. of Denver*, 720 F. App'x 434, 438 (10th Cir. 2017).

Plaintiffs aver that "Mr. Waterhouse's crime, if any, was limited to misdemeanor property damage and not severe." *Am. Compl.* [#25] ¶ 256.[3]  A nonviolent misdemeanor clearly does not justify deadly force.  *See Casey*, 509 F.3d at 1285 (citing *Graham* 490 U.S. at 396).  However, Defendant DiRezza argues that because "a fire was started in the basement while Mr. Waterhouse was the only one present[,] . . . officers certainly would have had probable cause to detain Mr. Waterhouse on suspicion of [a]rson, a class 3 felony."  *DiRezza Reply* [#32] at 6; *see also* Colo. Rev. Stat. §§ 18-4-101 to -105.  The Court notes that Plaintiffs do not affirmatively allege that either Mr. Waterhouse or the pepper balls fired by the Agents started the fire.  *See Am. Compl.* [#25] ¶ 145 (stating only that "[t]here was a fire in the back room where Mr. Waterhouse was"); *id.* ¶¶ 124-33 (listing conflicting accounts of the Agents as to whether the smoke began before, during, or after the firing of pepper balls).  Even viewing these facts in Plaintiffs' favor, the Court finds that the allegations show that the Agents could reasonably conclude that Mr. Waterhouse started the fire in the basement because (1) the Agents first saw the fire in the back room where Mr. Waterhouse had barricaded himself, (2) as far as the Agents knew, there was no one else in the room, and (3) Mr. Waterhouse was attempting to keep the door to the back room closed, so there is no indication that an alternate source of the fire, such as a

---

[3]  Defendant DiRezza asks the Court to take judicial notice of the fact that Mr. Waterhouse "had bonded out of jail . . . on charges of 2nd [sic] Degree Assault on a Peace Officer."  *DiRezza's Motion* [#28] at 2.  Defendant DiRezza is correct that, when adjudicating a motion to dismiss, the Court may consider outside documents subject to judicial notice, including court documents and matters of public record.  *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006).  However, the Court is otherwise limited to the factual allegations "within the four corners of the complaint." *Mobley*, 40 F.3d at 340.  Although the Court may take judicial notice of Mr. Waterhouse's prior charges, the inquiry in an excessive force claim is whether Defendant DiRezza acted reasonably in response to the circumstances confronting him.  *Graham*, 490 U.S. at 397.  The Amended Complaint [#25] contains no allegation that any Agent, including Defendant DiRezza, knew that Mr. Waterhouse had been charged with assault on a peace officer.  Accordingly, the Court finds that it would be inappropriate to take notice of Mr. Waterhouse's prior charges for purposes of adjudicating the Motions [#28, #29].

pepper ball, traveled through the door and past Mr. Waterhouse's barricade into the back room.  *See id.* ¶¶ 141-45; *see also Ashcroft*, 556 U.S. at 679, 682 (noting that, when evaluating a complaint's factual allegations in light most favorable to the plaintiff, courts may "draw on [their] judicial experience and common sense" and consider "obvious alternative explanation[s]").

The Court further notes that there is no allegation that Mr. Waterhouse acted violently toward the Agents while he may have set fire to the basement.  However, starting a fire in a house with people inside is a serious act that can justify a response of deadly force.  *See Marie Ramirez v. Guadarrama*, 844 F. App'x 710, 714 (5th Cir. 2021) (finding use of deadly force reasonable partly because "the severity of the threatened crime, i.e., felony arson, was considerable"); *Robinson v. Sauls*, 521 F. Supp. 3d 1282, 1293 (N.D. Ga. 2021) (observing that individual against whom deadly force was used had "arrest warrants for two violent felonies: attempted arson of his mother's home while she was therein, and aggravated assault with a deadly weapon on two police officers").  Because officers could have reasonably believed that Mr. Waterhouse committed arson, the Court concludes that the first *Graham* factor favors finding that Defendant DiRezza's use of deadly force was objectively reasonable.

As explained above, the severity of a crime on its own is unlikely to be dispositive of whether deadly force is reasonable.  Both *Marie Ramirez* and *Robinson* were decided on the basis of the immediacy of the threat to the officers, rather than the severity of arson as a crime.  *See Marie Ramirez*, 844 F. App'x at 714 (deadly force reasonable when suspect doused himself in gasoline, then advanced toward officers holding gas can and what appeared to be a lighter); *Robinson*, 521 F. Supp. 3d at 1300 (deadly force

reasonable after suspect refused commands to surrender peacefully and pointed gun at officers).  The Court therefore proceeds to the second *Graham* factor.

### b.    Immediacy of Threat

The second *Graham* factor is whether Mr. Waterhouse posed an immediate threat to the safety of Defendant DiRezza or others.  "[N]ot only is the second factor of singular importance, it also is the most 'fact intensive factor.'"  *Est. of Taylor*, 16 F.4th at 763 (quoting *Pauly*, 874 F.3d at 1216); *see also Est. of Valverde*, 967 F.3d at 1061.  To evaluate the immediacy and seriousness of a threat facing officers, the Tenth Circuit has set out four nonexclusive factors.  *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).  These factors include: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Id.*

### i.    Compliance with Commands

In regard to the first *Larsen* factor, the Court considers whether the Agents ordered Mr. Waterhouse to drop his weapon, and whether he complied with such commands. However, Plaintiffs allege—and the Court therefore accepts as true—that Mr. Waterhouse was unarmed when Defendant DiRezza shot him.  *Am. Compl.* [#25] ¶ 162; *see Shero*, 510 F.3d at 1200.  While the Agents knew that Mr. Waterhouse had a hammer in the basement, there is no indication that he had the hammer in his hands while the Agents were in the basement.  *See Am. Compl.* [#25] ¶ 162.  Plaintiffs admit that Mr. Waterhouse "may have had a four-foot stick that looked sort of like a shower rod."  *Id.* ¶ 144.  However,

they allege that Mr. Waterhouse was not holding the stick, or anything else, when he ran out of the basement room while Defendant DiRezza and Agent Williams were there. *Id.* ¶ 162.

As to whether Mr. Waterhouse complied with the Agents' commands, Plaintiffs allege that Defendant DiRezza did not command Mr. Waterhouse to stop running or give any warning before firing. *Id.* ¶¶ 179-81. Defendant DiRezza correctly states that officers are not *required* to give a warning before using deadly force if it is not feasible to do so. *See DiRezza's Motion* [#28] at 15; *Cordova v. City of Albuquerque*, 816 F.3d 645, 660 (10th Cir. 2016). The Court agrees that, based on the allegations that Mr. Waterhouse ran out of the closet suddenly and in Defendant DiRezza's general direction, the situation presents the type of "rapidly evolving circumstances" in which no warning may be necessary before using reasonable force. *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1175 (10th Cir. 2020). However, Defendant DiRezza cannot have it both ways—if Defendant DiRezza's failure to give a warning can be excused, Mr. Waterhouse cannot be faulted for failing to heed such a warning if none was given. Defendant DiRezza perseveres, arguing that Mr. Waterhouse escalated the situation by failing to comply with the Agents' earlier commands to exit the basement. *DiRezza's Reply* [#32] at 2. The Court rejects this distortion of the first *Larsen* factor, which focuses specifically on whether an individual complied with police commands to drop his weapon in the moments before officers used deadly force. *See, e.g.*, *Larsen*, 511 F.3d at 1260 (suspect "refused to cooperate with the officers' repeated orders to put down the knife"); *Thomson*, 584 F.3d at 1318 ("[Arrestee] was repeatedly told to put down his weapon, but he did not comply with the commands of the officers and instead moved the gun up and down

quickly.").  The Court therefore finds that the first *Larsen* factor weighs against finding that Mr. Waterhouse posed an immediate threat to Defendant DiRezza.

### ii.     Hostile Motions with a Weapon

The second *Larsen* factor evaluates whether an individual made hostile motions with a weapon toward officers.  Again, Plaintiffs allege that Mr. Waterhouse was unarmed when Defendant DiRezza shot him.  *Am. Compl.* [#25] ¶ 162.  Defendant DiRezza argues that "[Mr. Waterhouse] had previously been armed with a hammer and a four-foot long stick."  *DiRezza's Motion* [#28] at 15.  Although the Court notes Defendant DiRezza's choice of the word "armed," the Amended Complaint [#25] does not allege—and Defendant DiRezza does not appear to contest—that Mr. Waterhouse used the stick or hammer in a threatening manner at any point.  Defendant DiRezza contends that Mr. Waterhouse's act of "running directly toward an officer after refusing commands and resisting attempts to be taken into custody" is a sufficiently hostile action to make the use of deadly force reasonable.  *DiRezza's Reply* [#32] at 3.

In many cases where officers resort to deadly force, the suspect is either holding a gun, *see, e.g.*, *Pauly*, 874 F.3d 1197, or appears to reach for one, *see, e.g.*, *Est. of Taylor*, 16 F.4th at 767.  When an individual is unarmed or possesses a weapon with less lethal potential, courts evaluate the alleged hostile motions more critically.  *See Bond v. City of Tahlequa*, 981 F.3d 808, 820-21 (10th Cir. 2020), *rev'd on other grounds*, 142 S. Ct. 9 (2021) (holding that reasonable jury could find no hostile motion or immediate threat when individual "raise[d] hammer above his head" in a "defensive stance").

The Court agrees that suddenly running toward a police officer likely merits the use of *some* force.  *See Smith v. City of Roswell*, No. 15-1004 KG/KRS, 2017 WL

3172726, at *10 (D.N.M. May 25, 2017) (noting that officers were justified in tasing arrestee while he was "charging at the officers with a baton in his hand").  To prevail on his Motion [#28], however, Defendant DiRezza must show that Mr. Waterhouse posed a sufficiently grave threat to warrant the use of *deadly* force.  *Reavis*, 967 F.3d at 985.  The second *Larsen* factor evaluates hostile motions made with a weapon, rather than any hostile behavior, because "deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others."  *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009).  Mr. Waterhouse was unarmed, so he could not have made any hostile motions toward Defendant DiRezza with a weapon.  The Court therefore finds that the second *Larsen* factor weighs against finding Mr. Waterhouse posed an immediate threat to Defendant DiRezza.

### iii.    Distance

As for the third *Larsen* factor, the Amended Complaint [#25] does not specify exactly how much distance separated Mr. Waterhouse from Defendant DiRezza, Agent Williams, or the bottom of the stairs at the time Mr. Waterhouse was shot.  Defendant DiRezza was "roughly in the middle of the room" and Agent Williams stood "between Defendant DiRezza and the bottom of the stairs."  *Am. Compl.* [#25] ¶¶ 158-59.  Mr. Waterhouse apparently made it far enough into the room to be "shot at close range with the non-lethal super sock rounds" by Agent Williams.  *Id.* ¶ 173.  Defendant DiRezza argues that "Mr. Waterhouse must have been close to the bottom of the stairs when he was shot," because an Agent standing at the top of the stairs was able to see Mr. Waterhouse after he was shot. *DiRezza's Motion* [#28] at 16.  Based on these allegations,

the Court concludes that Mr. Waterhouse was in close proximity to Defendant DiRezza, Agent Williams, or both, at the time he was shot.  Therefore, the Court finds that the third *Larsen* factor weighs in favor of finding that Mr. Waterhouse posed an immediate threat to Defendant DiRezza.

### iv.    Manifest Intentions

In evaluating Mr. Waterhouse's manifest intentions under the final *Larsen* factor, the Court looks to whether a reasonable officer would have perceived Mr. Waterhouse's actions as threatening.  *See Est. of Taylor*, 16 F.4th at 770.  A suspect's actions may result in "conflicting interpretations" of his intentions, but officers' response to a threat is permissible so long as their assessment of the threat is reasonable.  *Bond*, 981 F.3d at 821; *see also Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (explaining that officer's assessment of threat of harm "need not be correct . . . as long as it is reasonable").  Importantly, while deadly force is reasonable when officers face the threat of serious physical harm, that "does not mean that any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death."  *Cordova*, 569 F.3d at 1190 (finding deadly force unreasonable when threat faced by officers was "general" and "disputed," rather than "actual and imminent").

Plaintiffs emphasize Agent Cook's assertion that Mr. Waterhouse appeared to be "just trying to run up the stairs at that point."  *Am. Compl.* [#25] ¶ 208.  Defendant DiRezza argues that Mr. Waterhouse's act of running directly toward him, combined with lighting the fire and earlier erratic behavior, manifested an intent to assault Defendant DiRezza.[4]

---

[4] Defendant DiRezza minimizes the allegations that Mr. Waterhouse was "suffering from a mental health crisis" and intended no harm.  *DiRezza's Motion* [#28] at 16.  To support this proposition, Defendant DiRezza cites *George v. Newman* to argue that "the source of [the arrestee]'s anger is not the material point," because "[w]hat matters is whether . . . he was visibly upset about

*DiRezza's Motion* [#28] at 16.   Defendant DiRezza further argues that "given the circumstances," a reasonable officer in Defendant DiRezza's position could conclude that "his life was in immediate danger."   *Id.*

The Court concludes that the allegations regarding Mr. Waterhouse's manifest intentions, as viewed by a reasonable officer, do not suggest a sufficiently serious threat to Defendant DiRezza to justify the use of deadly force.   As explained above, the fact that Mr. Waterhouse suddenly ran toward Defendant DiRezza and Agent Williams in a smoky basement could warrant the use of some force in response.   *See DiRezza's Motion* [#28] at 15.   However, even if he initially ran toward Defendant DiRezza, Mr. Waterhouse apparently made it past Defendant DiRezza and nearly to the bottom of the stairs before he was shot in the back.   *Id.* at 16.   This corroborates Agent Cook's assessment that Mr. Waterhouse appeared to be running for the stairs.   *Am. Compl.* [#25] ¶ 208.   Finally, and perhaps most importantly, Mr. Waterhouse was unarmed when Defendant DiRezza shot him.   *Id.* ¶ 162.

Viewing the allegations in the light most favorable to Plaintiffs, there were several other Agents close to Defendant DiRezza, and numerous non-lethal options on hand for responding to a distraught, unarmed, and mentally ill individual.   *Id.* ¶¶ 151-53, 171.   There

---

something when he approached [the officer]."   726 F. App'x 699, 705 (10th Cir. 2018) (granting qualified immunity for officer who grabbed arm of man angrily approaching patrol car and "firmly moved him away").   Defendant DiRezza misses the point.   The source of the plaintiff's anger in *George* was irrelevant to the excessive force analysis because the officer did not know why the individual was angry.   *George*, 726 F. App'x at 706.   The reasonableness of a use of force is compared to "a reasonable officer present at the scene."   *Id.*   Here, the Agents were aware that Mr. Waterhouse suffered from mental illness, had not behaved in a threatening way, was not physically imposing, and was armed with, at most, a stick.   *Am. Compl.* [#25] ¶¶ 35-36, 40-42. The Court therefore considers all these allegations in evaluating whether a reasonable officer would perceive Mr. Waterhouse as posing an "actual and imminent" risk of serious physical harm to Defendant DiRezza.   *Cordova*, 569 F.3d at 1190.

is no allegation to suggest that Mr. Waterhouse could be reasonably perceived as anything more than a risk of minor physical harm to Defendant DiRezza and the other Agents.[5]  *See Est. of Harmon v. Salt Lake City*, No. 20-4085, 2021 WL 5232248, at *4 (10th Cir. Nov. 10, 2021) (holding interpretation of unarmed suspect's threatening gestures and remarks to group of officers as serious physical threat could be found to be unreasonable).  The Court therefore finds that Mr. Waterhouse's manifest intentions, as viewed by a reasonable officer on scene, were to escape the basement rather than to seriously injure Defendant DiRezza or Agent Williams.

In sum, the Amended Complaint [#25] adequately alleges that Defendant DiRezza's use of deadly force contradicts the actions of every other Agent on the scene, who all uniformly made efforts to ensure deadly force was not used against Mr. Waterhouse.  *See Am. Compl.* [#25] ¶¶ 53-56, 85-90.  Defendant DiRezza knew that the other Agents had decided that Mr. Waterhouse's mental health crisis did not pose a serious threat.  *Id.* ¶¶ 109-110.  Despite all of the information available to him regarding the threat presented by Mr. Waterhouse, Defendant DiRezza used deadly force.  The Court finds that three of the four *Larsen* factors weigh against finding that a reasonable officer would perceive that Mr. Waterhouse posed an immediate and serious threat to Defendant DiRezza or others.  Accordingly, the second *Graham* factor weighs against finding that Defendant DiRezza's use of deadly force was reasonable.

---

[5]  Based on the Amended Complaint [#25], Defendant DiRezza at one point stated that Mr. Waterhouse charged at him with the stick in "both hands."  *Am. Compl.* [#25] ¶ 198.  Plaintiffs allege that this was one of several false statements Defendant DiRezza made about the incident. *See id.* ¶¶ 195-212.  Plaintiffs further allege that no other Agent reported seeing a stick from the time Mr. Waterhouse ran out of the closet to when the Agents carried him out of the basement after the shooting.  *Id.* ¶¶ 162, 169, 186.  Therefore, the Court accepts the well-pled allegation that Defendant DiRezza's statement was false for purposes of adjudicating Defendant DiRezza's Motion [#28].

###### c. **Active Resistance or Attempts to Evade Arrest**

As for the third and final *Graham* factor, it is unclear whether the Agents intended to formally arrest Mr. Waterhouse. *See Am. Compl.* [#25] ¶¶ 44-48. Regardless, Mr. Waterhouse undoubtedly resisted and attempted to evade the Agents' efforts to apprehend him. *See id.* ¶¶ 142-43. He refused to exit the basement and slammed the door to his back room shut when the Agents tried to open it. *Id.* The Court concludes that the third *Graham* factor supports the use of force by Defendant DiRezza.

Although the first and third *Graham* factors support the use of some force by Defendant DiRezza, the critical second *Graham* factor weighs heavily against a finding that Defendant DiRezza reasonably used deadly force. Viewing the allegations in the light most favorable to Plaintiffs, the Agents knew that Mr. Waterhouse was mentally ill, unarmed, and appeared to be running past Defendant DiRezza and toward the stairs when he was shot in the back. Defendants conclusorily assert that "Mr. Waterhouse demonstrated rapid, successive actions indicating an ability, and possibly a desire, to use deadly force against the officers on scene." *DiRezza's Motion* [#28] at 17. These arguments may be renewed on a motion for summary judgment. However, based on the allegations in the Amended Complaint [#25], the Court finds that Defendant DiRezza could not have reasonably viewed Mr. Waterhouse as possessing the ability to use deadly force against him or others.

Plaintiffs adequately allege that a reasonable officer in Defendant DiRezza's position would not have perceived Mr. Waterhouse as exhibiting the type of threat of "serious physical harm" required to justify the use of deadly force. *See Cordova*, 569 F.3d at 1192; *see also Stewart v. City of Prairie Vill.*, 904 F. Supp. 2d 1143, 1026 (D. Kan. 2012)

(denying qualified immunity when the plaintiff alleged mentally ill person reached for kitchen knife and officers shot her in the back even though they "believed it unlikely [the person] was going to harm herself or others").  Although "[i]t is with reluctance that we second-guess the split-second decisions of trained officers reacting to difficult situations in the line of duty," *Cordova*, 569 F.3d at 1190, the Court concludes that Plaintiffs have adequately alleged that Defendant DiRezza acted objectively unreasonably by using deadly force against Mr. Waterhouse.  The Court therefore finds that Plaintiffs sufficiently plead that Defendant DiRezza violated Mr. Waterhouse's Fourth Amendment rights.

**2.    Clearly Established Right**

The Court turns to the second prong of the qualified immunity analysis: whether the constitutional right purportedly violated by Defendant DiRezza was clearly established.  "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1268 (10th Cir. 2022) (internal brackets, ellipsis, and quotation marks omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).  "To establish that the law was clearly established in this context, the plaintiff must point to Supreme Court or Tenth Circuit precedents on point, or to the clear weight of authority from other circuit courts deciding that the law was as the plaintiff maintains." *Thompson v. Ragland*, 23 F.4th 1252, 1255 (10th Cir. 2022).  "[E]xisting law must have placed the constitutionality of the [public official's] conduct beyond debate."  *Id.* (quoting *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted).  However, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not

previously been held unlawful." *Thompson*, 23 F.4th at 1255-56 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 666 (2002) (brackets and internal quotation marks omitted)); *see also Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (noting that the Court "cannot find qualified immunity wherever we have a new fact pattern"). "We have therefore adopted a sliding scale to determine when law is clearly established." *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* at 1135-36. It is not necessary to show that "the very action in question has previously been held unlawful, [but] in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 1136 (internal alterations and quotation marks omitted).

Here, the Court finds that the law on December 19, 2019, was clearly established that an officer shooting an unarmed, mentally ill man in the back would commit a constitutional violation. The Court notes that the fact that Mr. Waterhouse was unarmed is not "outcome determinative," nor is the fact that "alternative, less intrusive" means of force were available. *Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005). However, it is beyond debate that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *King v. Hill*, 615 F. App'x 470, 477 (10th Cir. 2015) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). In cases where the Tenth Circuit has authorized deadly force against an unarmed suspect, the officers using deadly force had ample reason to believe they were at risk of serious bodily harm. *See, e.g.*, *Easter v. Cramer*, 785 F. App'x 602, 608 (10th Cir. Sept. 19, 2019) (finding reasonable officer would believe deadly force necessary when, during physical

altercation, suspect shoved officer underwater in pond in apparent attempt to drown him); *Blossom*, 429 F.3d at 965 (finding deadly force reasonable when suspect charged much smaller officer "at full speed," ignoring repeated commands to stop and screaming that he was going to take officer's gun).   While Mr. Waterhouse had undoubtedly behaved erratically, there is no suggestion that the Agents perceived him as a threat at any point. *See Am. Compl.* [#25] ¶¶ 52-55.   Moreover, unlike the officers in *Blossom* and *Easter*, Defendant DiRezza had backup close on hand.   *Blossom*, 429 F.3d at 967; *Easter*, 785 F. App'x at 604.   Even if Mr. Waterhouse acted threateningly by running toward Agent Williams and Defendant DiRezza, an individual's hostile actions do not make the use of deadly force reasonable if a reasonable officer would not believe he is in danger of serious physical harm.   *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003) (affirming denial of qualified immunity when suspect threw chunk of concrete at officers, missed, and was then shot eleven times in the back).   Therefore, the Court finds that the law was clearly established that shooting an unarmed, nonthreatening individual in the back is unconstitutional under the Fourth Amendment.

Accordingly, with respect to the Estate's Fourth Amendment excessive force claim, Defendant DiRezza's Motion [#28] is **denied**.

## B.    Municipal Liability Claim Against Defendant Lakewood

Defendant Lakewood, as a "[l]ocal governing bod[y]," is liable "directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."   *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).   To assert a

municipal liability claim against Defendant Lakewood, Plaintiffs must allege that: (1) a violation of constitutional rights occurred; (2) a relevant municipal policy or custom existed; and (3) the municipal policy or custom was the "moving force" behind the constitutional deprivation. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). As explained above, Plaintiffs have already adequately averred that Mr. Waterhouse's constitutional rights were violated. Thus, the Court turns to the remaining requirements of a municipal liability claim: whether Plaintiffs sufficiently allege that a municipal policy or custom by Defendant Lakewood existed, and that the relevant policy or custom was the moving force behind the constitutional deprivation.

A municipal policy or custom may be based on any of the following: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188-89 (10th Cir. 2010).

Plaintiffs allege that Defendant Lakewood's failure to adopt various policies or training procedures to "guide its officers with respect to their interactions with persons suffering from mental health issues" caused Mr. Waterhouse's death. *Am. Compl.* [#25]

¶¶ 222-24.  Specifically, Plaintiffs assert that the lack of specific training regarding use of force against mentally ill individuals contributed to a "deliberately indifferent culture towards the use of excessive and deadly force."  *Id.* ¶¶ 298-99.  These allegations fall squarely within the fifth category of municipal policies identified in *Brammer-Hoelter*.

A municipality's failure to adequately train, supervise, or discipline employees can be used to establish municipal liability if "that failure results from deliberate indifference to the injuries that may be caused."  *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  This standard is met if a "municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm."  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (internal quotation marks omitted).  A plaintiff may establish a municipality's constructive notice by demonstrating either "a pattern of tortious conduct" by employees or that the municipality's act or omission will result in a "highly predictable or plainly obvious" constitutional violation.  *Carr*, 337 F.3d at 1229.  "To satisfy the stringent deliberate indifference standard, 'a pattern of similar constitutional violations by untrained employees is ordinarily necessary.'"  *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)) (brackets and internal quotation marks omitted); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) (noting that only a "narrow range of circumstances justify[ ] a finding of deliberate indifference absent a pattern of violations").  Finally, "a single incident of excessive force can establish the existence of an inadequate

training program if there is some other evidence of the program's inadequacy." *Carr*, 337 F.3d at 1229 (quoting *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000)).

Plaintiffs identify a laundry list of alleged deficiencies in Defendant Lakewood's approach to interacting with individuals with mental health problems. *Response to Lakewood* [#31] at 9-10. Ultimately, though, Plaintiffs' claim boils down to the allegation that Defendant Lakewood's use of force training inadequately prepared its Agents to determine whether and what type of force is necessary against mentally ill persons. *See Am. Compl.* [#25] ¶¶ 278, 288-89. Plaintiffs argue that "[b]ecause it is inevitable that Lakewood police officers will respond to calls involving persons suffering from mental health issues, the deliberate choice to not provide those officers with adequate training was made with indifference to the injuries that would be caused." *Id.* ¶ 246.

Plaintiffs fail to allege, however, that any alleged deficiency in Defendant Lakewood's training of its Agents led to a "pattern of similar constitutional violations" that would give Defendant Lakewood notice that its training was inadequate. *Waller*, 932 F.3d at 1285; *see Simpson v. Little*, 500 F. Supp. 3d 1255, 1268 (N.D. Okla. 2020) (finding no municipal liability for inadequate deadly force training when the plaintiff cited only single unrelated incident). Plaintiffs must allege at least some "factual support regarding inadequacy of the training to show that [the defendant] had knowledge of its inadequacies . . . ." *See Est. of Holmes by & through Couser v. Somers*, 387 F. Supp. 3d 1233, 1262 (D. Kan. 2019) (finding that conclusory allegation that the municipal defendant had "repeated complaints" of excessive force was insufficient to allege notice of inadequate training).

Instead, Plaintiffs apparently argue that Defendant Lakewood had constructive notice because the need for training of officers "regarding the constitutional use of deadly force when dealing with unarmed, mentally ill persons . . . was so obvious, and the inadequacy of training was so likely to result in the violation of constitutional rights." *Am Compl.* [#25] ¶ 289. Plaintiffs assert that "[Defendant Lakewood] knew that its failure to provide this [mental health] training would lead to harms involving excessive force against mentally ill persons." *Response to Lakewood* [#31] at 11. Beyond these conclusory statements, Plaintiffs fail to argue that this incident falls into the "narrow range of circumstances" where the "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 63; *see also Talmadge v. Marner*, No. 21-cv-01829-STV, 2022 WL 1591600, at *6 (D. Colo. May 19, 2022) (granting motion to dismiss where the plaintiff failed to present facts showing that constitutional violations were "highly predictable or a plainly obvious consequence").

Plaintiffs offer no other specific factual allegations of inadequacy in Defendant Lakewood's use of force training that would make the single incident between Defendant DiRezza and Mr. Waterhouse sufficient to show Defendant Lakewood had notice of constitutional violations. *See Connick*, 563 U.S. at 67 (observing that single-incident notice arises when training results in an "utter lack of an ability to cope with constitutional situations," not when municipality fails to provide training on a "specific scenario related to the violation in [this] case"); *Calvo-Pino v. Weidl*, 514 F. Supp. 1321, 1330 (D. Kan. 2021) (finding that allegation of "a complete lack of training on Fourth Amendment standards that govern [certain traffic stops] would predictably lead to constitutional

violations"). Given that Defendant Lakewood's existing use of force training and policy apparently proscribes Defendant DiRezza's actions, *Am. Compl.* [#25] ¶¶ 272-77, it is unclear how Defendant Lakewood could have had constructive notice that additional mental health training would have prevented excessive force violations, *see City of Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had more or better training, sufficient to equip him to avoid the particular injury-causing conduct."). The Court is aware of no legal authority holding that the constitutional parameters for using deadly force change when an officer encounters a person suffering from mental illness.[6] Finally, the Court notes that the fact that Defendant DiRezza served as a less lethal weapons instructor does not sufficiently show inadequacy in Defendant Lakewood's use of force training program. *Am. Compl.* [#25] ¶¶ 286-88; *see Waller*, 932 F.3d at 1287 (finding that the plaintiff failed to adequately allege the municipal defendant had notice of inadequate use of force training, even though the defendant officer was use of force trainer for department).

Without evidence of a pattern of unconstitutional conduct, or specific allegations that inadequacies in Defendant Lakewood's use of force training made constitutional violations highly predictable, Plaintiffs fail to adequately allege that Defendant Lakewood had constructive notice of the type of constitutional violation committed by Defendant

---

[6] In their Response [#31], Plaintiffs argue that "[m]entally ill individuals often act in a way that is erratic or more unpredictable, but that does not mean that they become violent or dangerous." *Response to Lakewood* [#31] at 10. This may be true, but the Amended Complaint [#25] does not allege why Defendant Lakewood's existing use of force training is so obviously inadequate that constitutional violations, against mentally ill persons or otherwise, are highly predictable. *See Connick*, 563 U.S. at 63-64. In a potential future Second Amended Complaint, Plaintiffs may attempt to adequately allege that their claim fits into the narrow range of circumstances where a pattern of prior constitutional violations are not required to show constructive notice. For now, "it is not the [C]ourt's duty, after all, to make arguments for a litigant that he has not made for himself." *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015).

DiRezza.   The Court therefore need not reach the questions of whether Defendant Lakewood was deliberately indifferent to the allegedly inadequate training or whether Plaintiffs adequately allege that the failure to provide mental health training was the moving force behind Mr. Waterhouse's death.   *See Bryson*, 627 F.3d at 788; *Schneider*, 717 F.3d at 770.

Accordingly, Defendant Lakewood's Motion [#29] is **granted**, and Plaintiffs' municipal liability claim against Defendant Lakewood is **dismissed without prejudice** for failure to state a claim.   *See Reynoldson v. Shillinger*, 907 F.2d 124, 127 (10th Cir. 1990) (holding that dismissal without prejudice is appropriate when plaintiff has made allegations "which, upon further investigation and development, could raise substantial issues").

## C.   State Law Battery Causing Wrongful Death Claim Against Defendant DiRezza

Finally, Ms. Waterhouse brings a wrongful death claim against Defendant DiRezza under Colo. Rev. Stat. §§ 13-21-201 to -204.   However, the CGIA immunizes public employees from tort liability "unless the act or omission causing injury was willful and wanton."   Colo. Rev. Stat. § 24-10-118(2)(a); *see generally* Colo. Rev. Stat. §§ 24-10-101 to -120.   Plaintiffs assert that Defendant DiRezza "consciously disregarded a substantial and unjustifiable risk of danger of death or serious bodily injury to Mr. Waterhouse."   *Am. Compl.* [#25] ¶ 309.   Plaintiffs further contend that Defendant DiRezza's "intentional infliction of physical harm upon Mr. Waterhouse" constitutes "willful and wanton conduct."   *Id.* ¶¶ 308, 310.   Defendant DiRezza argues that "Plaintiff's allegations about [Defendant DiRezza's] willful and wanton conduct are conclusory and insufficient to overcome the immunity bestowed by the CGIA."   *DiRezza's Motion* [#28] at 18.

The CGIA does not define "willful and wanton" conduct.  Courts addressing the issue generally use the definition provided in Colorado's exemplary damages statute, Colo. Rev. Stat. § 13-21-102, which defines willful and wanton conduct as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."  *Feltman v. Europe*, No. 18-cv-3113-WJM-STV, 2019 WL 6215445, at *8 (D. Colo. Nov. 21, 2019) (citing *Zerr v. Johnson*, 894 F. Supp. 372, 376 (D. Colo. 1995); *Moody v. Ungerer*, 885 P.2d 200, 204 (Colo. 1994)).  The Colorado Supreme Court has explained that the hallmark of willful and wanton conduct is "a conscious disregard of the danger" to others.  *Martinez v. Est. of Bleck*, 379 P.3d 315, 323 (Colo. 2016).  In connection with an excessive force claim, a finding that an officer acted objectively unreasonably is necessary but not sufficient to show that an officer's conduct was willful and wanton.  *Sisneros v. Off. of Pueblo Cnty. Sheriff*, No. 09-cv-01646-PAB-MJW, 2011 WL 882618, at *6 (D. Colo. Mar. 10, 2011).

The Court finds that Plaintiffs adequately allege that Defendant DiRezza acted willfully and wantonly when he shot Mr. Waterhouse.  Viewing the allegations in the light most favorable to Plaintiffs, Defendant DiRezza knew that Mr. Waterhouse was unarmed, that other Agents were present with non-lethal weapons, and that Mr. Waterhouse was experiencing a mental health crisis.  *Am. Compl.* [#25] ¶¶ 170-71, 215-17.  As explained above, the facts alleged in the Amended Complaint [#25] support the conclusion that Mr. Waterhouse ran toward the stairs in an attempt to escape the burning basement, rather than acted threateningly toward Defendant DiRezza.  Further, Defendant DiRezza must have known that shooting Mr. Waterhouse with his duty weapon would put Mr.

Waterhouse in danger of death or serious injury.  Finally, the allegations that Defendant

DiRezza falsely reported the circumstances surrounding his shooting of Mr. Waterhouse

suggest that Defendant DiRezza was conscious of the fact that his conduct violated Mr.

Waterhouse's rights.  *See Am. Compl.* [#25] ¶¶ 195-212.  The Court finds that these

allegations plausibly state that Defendant DiRezza acted with conscious disregard for Mr.

Waterhouse's rights and safety.[7]  *See A.B., by & through Ybarra v. City of Woodland Park*,

174 F. Supp. 3d 1238, 1249 (D. Colo. 2016) (finding evidence that officer "fired shots into

a moving vehicle which was trying to flee rather than fight" sufficiently showed willful and

wanton conduct); *Est. of Ceballos v. Husk*, No. 15-cv-01783-RPM, 2017 WL 2377118, at

*6 (D. Colo. June 1, 2017) (finding sufficient evidence of willful and wanton conduct by

defendant officer, including "failure to use de-escalation techniques, lack of immediate

danger to the public, [and] failure to wait for [another officer] to retrieve his less lethal

shotgun").  Because Plaintiffs adequately allege that Defendant DiRezza's conduct was

willful and wanton, the Court finds he is not entitled to sovereign immunity under the CGIA.

---

[7]  Defendant DiRezza cites three Colorado Court of Appeals cases, beginning with—although incompletely cited—*Gray v. University of Colorado Hospital Authority*, 284 P.3d 191, 198 (Colo. App. 2012).  *DiRezza's Motion* [#28] at 18 (citing *Gray*, 284 P.3d at 198; *Wilson v. Meyer*, 126 P.3d 276, 282-83 (Colo. App. 2005); *Peterson v. Arapahoe Cnty. Sheriff*, 72 P.3d 440, 444 (Colo. App. 2003)).  All three cases stand for the proposition that, "when a plaintiff alleges that a public employee's acts or omissions were willful and wanton, the specific factual basis of such allegations shall be stated in the complaint."  *Gray*, 284 P.3d at 198 (internal quotation marks omitted).  Defendant DiRezza argues that Plaintiffs fail to meet this requirement.  *DiRezza's Motion* [#28] at 18.  However, in the Amended Complaint [#25], Plaintiffs offer more than thirty pages of allegations detailing the entirety of the encounter between Mr. Waterhouse, Defendant DiRezza, and the other Agents.  These allegations form the factual basis of Plaintiffs' state tort claim premised on Defendant DiRezza's allegedly willful and wanton conduct.  *Am. Compl.* [#25] ¶¶ 303-12.  It is unclear exactly what specific factual allegations Defendant DiRezza thinks are missing from Plaintiffs' claims.  The Court therefore concludes that Plaintiffs adequately state the specific factual basis of their allegations of Defendant DiRezza's willful and wanton conduct.

Accordingly, with respect to Ms. Waterhouse's state law tort claim, Defendant DiRezza's Motion [#28] is **denied**.

### IV.  Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that Defendant DiRezza's Motion [#28] is **DENIED**.[8]

IT IS FURTHER **ORDERED** that Defendant Lakewood's Motion [#29] is **GRANTED**, that Plaintiffs' sole claim against Defendant Lakewood under 42 U.S.C. § 1983 is **DISMISSED without prejudice** for failure to state a claim.

Dated: July 14, 2022

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge

---

[8]  This denial includes Defendant DiRezza's cursory request for a stay pending determinations of Defendant DiRezza's qualified immunity and his request that the Court decline supplemental jurisdiction over Plaintiffs' state tort claim, should all federal claims be dismissed.  *DiRezza's Motion* [#28] at 19.  The Court notes that it has separately stayed the case at Defendants' request pending adjudication of the Motions [#28, #29].  *See Order* [#42].