IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00982-KAS

ESTATE OF JASON WATERHOUSE, through its personal representative Heather
Lopez, and
AMBER WATERHOUSE, daughter of Jason Waterhouse, deceased,

      Plaintiffs,

v.

MARC DIREZZA, Sergeant, in his individual capacity,

      Defendant.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

This matter is before the Court on Defendant's **Motion for Summary Judgment** [#65] (the "Motion"). Plaintiffs filed a Response [#71] in opposition to the Motion [#65], and Defendant filed a Reply [#75]. The Court has reviewed the briefs, the entire case file, and the applicable law, and is sufficiently advised in the premises.[1] Based on the following, the Motion [#65] is **GRANTED**.

## I. Background

Heather Lopez is the sister of Jason Waterhouse and is the personal representative of Plaintiff Estate of Jason Waterhouse. Plaintiff Amber Waterhouse is Mr. Waterhouse's daughter. Defendant is a sergeant and experienced tactical supervisor with the Lakewood Police Department ("LPD") Special Weapons and Tactics ("SWAT") who shot and killed Mr. Waterhouse during the events described below. In the present Motion

---

[1] This case has been referred to the undersigned for all purposes pursuant to 28 U.S.C. § 636(c), on consent of the parties. *See Consent* [#11]; *Order* [#14]; *Reassignment* [#66].

[#65], Defendant seeks entry of summary judgment in his favor on both remaining claims:[2] (1) excessive force, in violation of the Fourth Amendment, asserted solely by Plaintiff Estate of Jason Waterhouse, and (2) battery causing wrongful death, in violation of Colo. Rev. Stat. § 13-21-201 et seq., asserted solely by Plaintiff Amber Waterhouse. *See Am. Compl.* [#25] ¶¶ 251-65, 303-12.

Unless otherwise noted, the following facts are undisputed for purposes of resolving the present Motion [#65]. *See Final Table of Facts Relating to Def.'s Motion for Summary Judgment* [#75-1]. On December 19, 2019, a woman named Faye Rovira called 9-1-1 to report the following information which had been communicated to her by Ms. Lopez: Mr. Waterhouse was agitated and had barricaded himself under the stairs at Ms. Lopez's home; he had been like this since the night before; he was armed with a hammer and was striking objects inside the home; "he was on something" like alcohol and methamphetamine (his drug of choice); he had not been diagnosed with any mental illness; he had done things like this before when he was using alcohol; he had made a homemade weapon (a screwdriver with some kind of a blade on it described as a "shiv") that Ms. Lopez had taken from him, although she was unaware if he had other weapons with him; and he had been throwing items at Ms. Lopez before she called Mr. Waterhouse's bond-person. *Id.* at 1-2 (Fact #2).

Around 3:19 p.m., officers from the LPD were dispatched to Ms. Lopez's home in Lakewood, Colorado. *Id.* at 1 (Fact #1). Prior to arriving on scene, they were advised that there were no guns in the house, that Mr. Waterhouse was hearing voices and thought

---

[2] On July 14, 2022, then-Magistrate Judge Kristen L. Mix dismissed Plaintiffs' sole 42 U.S.C. § 1983 claim against the City of Lakewood for Failure to Properly Train or Supervise and/or Policy or Custom of Excessive Force. *Order* [#44].

that someone was coming to hurt him, and that he was the only person inside the residence. *Id.* at 13 (Facts #65, #66, #67). When they arrived at 3:32 p.m., they were advised that Mr. Waterhouse was currently out on bond for assaulting an officer and throwing a rock at the window of his sister's last residence. *Id.* at 2 (Fact #3). Agents believed that Mr. Waterhouse was likely on methamphetamine because of reported prior use, his having been awake for an extended period, paranoid behavior, and possible delusions. *Id.* (Fact #4). Testing later confirmed this belief. *Id.* (Fact #4).

The first officers on the scene requested less-lethal weapons to expand options in case force was necessary. *Id.* (Fact #5). While outside the residence, officers shouted lawful orders for Mr. Waterhouse to exit the basement but only heard crashing sounds from within the home. *Id.* at 2-3 (Fact #6). Agents advised Ms. Lopez that they would probably not try to force Mr. Waterhouse out if she did not want them to charge him for the damage to the home, to which she responded: "Then yeah. Then if that's what it takes cuz I can't deal with this." *Id.* at 3 (Fact #7). When Ms. Lopez confirmed that LPD officers had permission to enter the home to remove Mr. Waterhouse, Sergeant Ebeling entered with several agents. *Id.* (Fact #8). Officers moved inside to the top of the stairs leading to the basement. *Id.* (Fact #9).

Sgt. Ebeling is a SWAT negotiator with extensive experience and training in negotiation tactics. *Id.* (Fact #10). He attempted various tactics to coax Mr. Waterhouse into view, but Mr. Waterhouse, who had a hammer, refused to cooperate with official orders as he barricaded himself underneath the stairs of the basement.[3] *Id.* (Fact #10).

---

[3] The parties dispute whether Mr. Waterhouse was engaging in "repeated violent attacks on the physical structure" where he was barricading himself. *Final Table of Facts* [#75-1] at 3 (Fact #10).

Mr. Waterhouse yelled back at Sgt. Ebeling and other officers such things as "get some," "come get some," "I want to get hurt," "faggots," "nigger," "mother fucker," "I got something for you," and "shit's gonna fly mother fucker." *Id.* at 3-4 (Fact #11). Officers tried for over an hour to resolve the standoff safely and harmlessly through the use of various de-escalation techniques. *Id.* at 4 (Fact #12). Rather than cooperating, Mr. Waterhouse set the basement on fire during this time.[4] *Id.* (Fact #13).

Defendant was training officers when police were asked to respond to Ms. Lopez's residence. *Id.* (Fact #14). During the protracted standoff, Defendant contacted Sgt. Ebeling to offer his help if he was needed, which Sgt. Ebeling welcomed because of Defendant's "exceptional balance of [ ] tactical experience and de-escalation." *Id.* (Fact #15). A few minutes after Defendant arrived to help, smoke came wafting from the basement where Mr. Waterhouse was hiding. *Id.* (Fact #16). Based on the circumstances, Sgt. Ebeling was concerned that the Fire Department would be unable to address the fire with Mr. Waterhouse still inside. *Id.* at 5 (Fact #17). Sgt. Ebeling determined that LPD officers would enter the basement to attempt to both locate the fire and attempt to extract Mr. Waterhouse. *Id.* (Fact #18).

At approximately 5:23 p.m., seven members of the LPD entered the basement to investigate the source of the smoke, find the fire, locate Mr. Waterhouse, gain his compliance, and safely remove Mr. Waterhouse from the home. *Id.* (Fact #19). Defendant was armed with a pistol and a baton, and he was assigned to cover and protect the safety of other officers by use of lethal force, which was one safety component among an array

---

[4] The parties dispute whether Mr. Waterhouse "used this time to accelerate the situation." *Final Table of Facts* [#75-1] at 4 (Fact #13).

of non-lethal options assigned to other officers, including tasers, a K9, and a less-lethal shotgun that fired a beanbag.[5] *Id.* (Fact #20). The officers were easily identifiable in full uniform. *Id.* at 7 (Fact #28).

Upon entering the basement, officers realized the fire was much more substantial than they initially thought. *Id.* at 5-6 (Fact #21). The fire grew rapidly as thick, dark smoke encircled the basement around and above them[6] as they tried to find the source of the fire and Mr. Waterhouse.[7] *Id.* at 6 (Fact #22). Almost immediately, the chaotic environment was an obvious risk to the officers' safety. *Id.* (Fact #23).

Once in the basement, officers caught a glimpse of Mr. Waterhouse shoving a large stick through the wall before he slammed the southeast bedroom door shut. *Id.* (Fact #26). It is undisputed that, at various times throughout these events, Mr. Waterhouse had a deadly weapon in his possession. *Id.* at 11 (Fact #52). Upon seeing Mr. Waterhouse, officers gave additional commands for him to come out and show them his hands.[8] *Id.* at 6-7 (Fact #27). While in the basement, Defendant heard an agent yell that Mr. Waterhouse possessed a club; a similar statement was made over radio. *Id.* at 7 (Fact #29). Agents located the likely source of the fire to be under the stairwell, which one agent

---

[5] The parties dispute whether Defendant was a necessary addition to the group of officers who entered the basement. *Final Table of Facts* [#75-1] at 5 (Fact #20).

[6] The parties dispute how clearly the officers were able to see in the basement. *Final Table of Facts* [#75-1] at 6 (Fact #22), 8-9 (Fact #37).

[7] Without adequate evidentiary citation by either party, the parties dispute the following fact: "Although officers had been trying to see Waterhouse since they arrived, no one had seen him clearly inside the basement until they went down into the confined space." *Final Table of Facts* [#75-1] at 6 (Fact #25).

[8] The parties dispute the level of cooperation, if any, by Mr. Waterhouse. *Final Table of Facts* [#75-1] at 6-7 (Fact #27).

other than Defendant described as flames "blasting through[;] it was like a vacuum of flame . . . actively coming into the basement."[9] *Id.* (Fact #30). Officers knew they needed to get out of the basement right away. *Id.* (Fact #31).

Sgt. Ebeling estimates that officers were in the basement for two minutes before he ordered everyone to leave because of the intensity of the smoke and fire. *Id.* at 7-8 (Fact #32). The dispatch records suggest the entire time in the basement was approximately one minute or less. *Id.* at 8 (Fact #35). Both Sgt. Ebeling and Defendant knew the smoke and fire were too dangerous and ordered the team to exit the basement via the burning stairs. *Id.* at 8 (Fact #33). Just seconds after the announcement of Mr. Waterhouse holding a large stick, agents called for assistance from the fire department and announced there were multiple agents suffering from smoke inhalation. *Id.* (Fact #34). At least one agent later had to be given oxygen due to his smoke inhalation. *Id.* at 6 (Fact #24). Agent Williams' hair was singed. *Id.* at 8 (Fact #36).

Every officer in the basement was in the process of leaving the basement when Mr. Waterhouse came out[10] and moved toward officers in the small, cluttered room.[11] *Id.* at 9 (Fact #38), 10 (Fact #45). Defendant and Agent Williams were the last cover officers still in the basement. *Id.* at 9 (Fact #39). Because Defendant was lethal coverage and a supervisor, he had told Agent Williams to get out, ensuring that Defendant would be the

---

[9] Plaintiffs dispute this fact only to the extent that Defendant himself "only 'thought' he saw some orange flames, not that flames were blasting through like a vacuum of flame." *Final Table of Facts* [#75-1] at 7 (Fact #30).

[10] Plaintiffs dispute this fact only to the extent that Defendant characterizes the officers as "fleeing" and Mr. Waterhouse's location as his "hiding place." *Final Table of Facts* [#75-1] at 9 (Fact #38).

[11] The parties dispute whether Mr. Waterhouse "charged at officers" or whether he was "just trying to run up the stairs." *Final Table of Facts* [#75-1] at 10 (Fact #45).

last to leave the basement to try and protect the others. *Id.* (Fact #40). While several officers hurried up the stairs, Mr. Waterhouse burst out of hiding and rushed toward Defendant and Agent Williams quickly.[12] *Id.* (Fact #41). Agent Williams thought that Mr. Waterhouse wanted to kill him.[13] *Id.* at 11 (Fact #50). When Mr. Waterhouse came out of the back room, it looked to Agent Cook, who was observing through the basement window from outside of the building, like Mr. Waterhouse was just trying to run up the stairs.[14] *Id.* at 14 (Fact #69).

Because of the smoke, fire, and other officers in the stairwell, movement within the space was very constrained. *Id.* at 10 (Fact #46). Defendant feared a struggle in the burning basement could be deadly. *Id.* (Fact #47). Defendant also feared for the safety of officers fleeing because the burning stairwell was the only egress from the basement. *Id.* (Fact #48). He perceived Mr. Waterhouse holding a deadly weapon.[15] *Id.* at 11 (Fact #53). However, solely for purposes of the present Motion [#65], Defendant concedes that, when Mr. Waterhouse came out of the back room, he did not actually have anything in his hands. *Id.* at 13-14 (Fact #68). According to Defendant, the fact that he perceived Mr.

---

[12] The parties dispute the amount of time available to Defendant to react, including whether he had time to aim down the sight of his pistol before firing. *Final Table of Facts* [#75-1] at 9 (Fact #41), 11 (Fact #49) (disputing whether Mr. Waterhouse forced a split-second decision).

[13] Plaintiffs dispute the reasonableness of Agent Williams' belief, including whether he saw Mr. Waterhouse holding a deadly weapon. *Final Table of Facts* [#75-1] at 11 (Facts #50, #51).

[14] Defendant disputes this fact only to the extent that it omits the context of Agent Cook's statements, given that he also stated that he could not opine as to Mr. Waterhouse's intent, that he was not in a position to accurately perceive everything that occurred in the basement, and that he did not believe that Defendant's conduct was unreasonable. *Final Table of Facts* [#75-1] at 14 (Fact #69).

[15] Plaintiffs dispute whether Defendant's perception was reasonable. *Final Table of Facts* [#75-1] at 11 (Fact #53).

Waterhouse as having a weapon was the most imminent reason why Defendant felt a threat of serious bodily harm. *Id.* at 14 (Fact #70).

Agent Williams fired a less-lethal shotgun at Mr. Waterhouse when Mr. Waterhouse charged at him because that was the weapon Agent Williams had in his hands.[16] *Id.* at 12 (Fact #57). A bean bag from the weapon held by Agent Williams struck Mr. Waterhouse in the lower left abdomen. *Id.* (Fact #59). Agent Williams believes the force of the beanbag striking Mr. Waterhouse caused him to rotate left, toward the stairwell. *Id.* (Fact #60). In addition, Defendant fired at Mr. Waterhouse's torso as quickly as he could with one gunshot entering Mr. Waterhouse's back.[17] *Id.* at 12 (Fact #55).

Defendant estimates the total time from his first to last shot was less than a second. *Id.* (Fact #56). Agent Yoxheimer had gone back upstairs before he heard shots. *Id.* (Fact #61). The entire time between the first shot and last shot (both lethal and less lethal) Agent Yoxheimer heard was no more than 3 seconds. *Id.* at 13 (Fact #62).

Sgt. Ebeling was approximately four stairs up when he heard the gunshots from behind him in the basement. *Id.* at 9 (Fact #42). He and other officers went back down, pulling Mr. Waterhouse out of the burning home. *Id.* at 10 (Fact #43). Sgt. Ebeling was outside the home with Mr. Waterhouse and his fellow officers when he announced, "shots fired" – just seconds after Mr. Waterhouse was reported to be using a large stick or club.[18]

---

[16] The parties dispute whether Agent Williams *would have* fired lethal rounds at Mr. Waterhouse if he had been the lethal cover, but the Court finds that what Agent Williams would have done is immaterial for purposes of adjudicating the present Motion [#65]. *Final Table of Facts* [#75-1] at 12 (Fact #58).

[17] The parties dispute whether Defendant intended to fire at Mr. Waterhouse's *front* torso as Mr. Waterhouse moved toward them. *Final Table of Facts* [#75-1] at 12 (Fact #55).

[18] Plaintiff disputes this fact only to the extent Defendant characterizes it as "[i]llustrating the brevity" of the situation. *Final Table of Facts* [#75-1] at 10 (Fact #44).

*Id.* (Fact #44). A similar object was later found in the northwest corner of the main basement room. *Id.* at 11 (Fact #54).

Mr. Waterhouse died from a bullet that traveled from the right side of his mid-back through the left side of his chest. *Id.* at 13 (Fact #63). No bullet defects were found on the central wall of the basement; one bullet was found in the doorway Mr. Waterhouse ran out of, and two likely bullet defects were found on a chair within the southeast room and the bed within the southeast room. *Id.* (Fact #64). According to Defendant, if Mr. Waterhouse "had come out without a weapon, this wouldn't have happened."[19] *Id.* at 14 (Fact #71).

## II. Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Pursuant to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

In determining whether summary judgment is appropriate, the Court resolves factual disputes and draws reasonable inferences in favor of the nonmovant. *Chase Mfg., Inc. v. Johns Manville Corp.*, 79 F.4th 1185, 1195 (10th Cir. 2023). However, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

---

[19] Defendant disputes this fact only to the extent that it omits the context of the statement, i.e., that Defendant was referring to this event generally and that, had Mr. Waterhouse cooperated, none of this would have happened. *Final Table of Facts* [#75-1] at 14 (Fact #71).

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks and citation omitted); *see also N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171-72 (10th Cir. 2021) ("To survive a motion for summary judgment, the nonmoving party must show more than '[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position . . . there must be evidence on which the jury could reasonably find for the [nonmoving party].'") (alterations and omission in original) (citation omitted). To determine whether a genuine issue of material fact exists, the Court considers "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). In other words, an issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party, and a fact is material if it might affect the outcome of the case under the governing substantive law. *Id.* at 248.

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *Anderson*, 477 U.S. at 248, 256. When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the court a lack of evidence for the nonmovant on an

essential element of the nonmovant's claim." *Adler*, 144 F.3d at 671. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

### III. Analysis

Before proceeding to the merits of the claims, the Court addresses Plaintiffs' argument that four declarations submitted by Defendant should be disregarded by the Court as sham affidavits on the basis that they were signed after the close of discovery and purport to supplement the four officers' deposition testimony. *Response* [#71] at 20-21 (citing *Def.'s Ex. 6, Decl. of Cook* [#65-6]; *Def.'s Ex. 7, Decl. of Ebeling* [#65-7]; *Def.'s Ex. 11, Decl. of Def.* [#65-11]; *Def.'s Ex. 14, Decl. of Williams* [#65-14]). Plaintiffs have provided no legal authority, and the Court is aware of none, holding that affidavits signed after the close of discovery may not be utilized as evidence in connection with a motion for summary judgment.

Pursuant to *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986), when adjudicating a summary judgment motion, the Court may disregard an affidavit which conflicts with the affiant's prior sworn statements if the Court concludes that the affidavit was submitted in an attempt to create a sham fact issue. In deciding whether a conflicting statement in an affidavit is a sham, the Court examines such as factors as "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was

based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks*, 796 F.2d at 1237.

The first step in this analysis, however, is identification of how the affidavit conflicts with the prior deposition testimony. *Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009). Here, Plaintiffs have not identified any contradictions. *Response* [#71] at 20-21; *see Law Co., Inc.*, 577 F.3d at 1169 (stating that the party seeking must "identify any such contradiction"). Further, although not the job of the Court to compare the entire evidentiary record to identify any contradiction(s), the Court notes that, in its review of the summary judgment record in its adjudication of the present Motion [#65], it has identified no obvious apparent conflict between the officers' declarations and their prior deposition testimony. Thus, Plaintiffs' request for the Court to disregard the four Declarations [#65-6, #65-7, #65-11, #65-14] is denied.

## A.    Fourth Amendment: Excessive Force

Defendant argues that he is entitled to qualified immunity with respect to the Estate of Jason Waterhouse's Fourth Amendment excessive force claim. *Motion* [#65] at 10. The doctrine of qualified immunity "shields government officials performing discretionary functions from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a defendant asserts qualified immunity, the burden shifts to the plaintiff to satisfy a strict two-part test demonstrating that the defense is not applicable. *Fisher v. City of Las Cruces*, 584 F.3d 888, 893 (10th Cir. 2009). First, viewing the evidence in the light

most favorable to the plaintiff, the plaintiff must demonstrate that a defendant's actions violated a constitutional or statutory right. *Id.* Second, "the plaintiff must show that the right was clearly established at the time of the alleged unlawful activity." *Id.*

### 1. Constitutional Violation

"[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Accordingly, when determining whether Defendant violated Mr. Waterhouse's constitutional rights, the excessive force claim is "governed by the Fourth Amendment's 'objective reasonableness' standard." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010). "The precise question asked in an excessive force case is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)) (internal quotation marks omitted). The Court's "review of a Fourth Amendment excessive force claim looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020) (citation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 1135 (quoting *Kisela v. Hughes*, 584 U.S. __, __, 138 S. Ct. 1148, 1152 (2018)); *see also City and County of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015) ("The Constitution is not blind to the fact that police officers are often forced to make split-second judgments.") (internal quotation marks

omitted). "Assessing the reasonableness of the force 'requires careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Emmett*, 973 F.3d at 1135 (quoting *Graham*, 490 U.S. at 396).

When evaluating the use of deadly force, the three *Graham* factors are applied to "help structure this inquiry." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 762 (10th Cir. 2021). However, "[a]lthough the first and third [*Graham*] factors can be particularly significant in a specific case, the second factor—whether there is an immediate threat to safety—'is undoubtedly the most important . . . factor in determining the objective reasonableness of an officer's use of force.'" *Est. of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020) (quoting *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017)). The importance of the second *Graham* factor is "particularly true in a deadly force case, because deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Reavis ex rel. Est. of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (citation and internal quotation marks omitted); *see also Est. of Valverde*, 967 F.3d at 1061 ("[I]t would be insignificant whether [a suspect] was to be arrested for a minor crime . . . if it reasonably appeared that he was about to shoot a gun at an officer from close range."). The Court therefore considers all three *Graham* factors, but places particular weight on whether Mr. Waterhouse posed an immediate threat to Defendant and/or the other officers who were on the scene.

### a.    Severity of Crime

When contemplating the severity of a crime under the first *Graham* factor, the felony or misdemeanor status of the crime is an essential consideration. *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007). Courts may additionally consider whether the act was accompanied by violence. *Est. of Ronquillo by & through Est. of Sanchez v. City and County of Denver*, 720 F. App'x 434, 438 (10th Cir. 2017).

Defendant asserts that Mr. Waterhouse exhibited an extreme indifference to the value of human life because officers were clearly present when he lit the home on fire. *Motion* [#65] at 11 (citing *Def.'s Ex. 8, Depo. of Ebeling* [#65-8] at 40:5-11; *Def.'s Ex. 9, Tr. of Yoxheimer* [#65-9] at 4-5, 24-28; *Def.'s Ex. 17, Burned Stairs and Door Opening* [#65-17]; *Def.'s Ex. 18, Fire Damage to SE Bedroom* [#65-18]; *Def.'s Ex. 19, Fire Damage to SW Bedroom Door* [#65-19]; *Def.'s Ex. 20, Fire Damage to Underside of Stairs* [#65-20]; *Def.'s Ex. 21, Presumed Fire Origin* [#65-21]; *Def.'s Ex. 22, Damage in Basement Main Room* [#65-22]; *Def.'s Ex. 23, Fire Damage SW Bedroom* [#65-23]; *Def.'s Ex. 24, Smoke Damage Upstairs* [#65-24]; *Def.'s Ex. 25, Doorway with Smoke* [#65-25]). Defendant asserts that Mr. Waterhouse committed a class 3 felony by committing first degree arson. *Reply* [#75] at 2 (citing Colo. Rev. Stat. § 18-4-102). Defendant also notes that Mr. Waterhouse's conduct felt aggressive to officers inside the house because he was extremely angry and had shouted provocative expletives at officers before he lit the house on fire. *Motion* [#65] at 11 (citing *Def.'s Ex. 5, Hagerman Notes* [#65-5]; *Def.'s Ex. 8, Depo. of Ebeling* [#65-8] at 41:6-23, 53:20-54:3; *Def.'s Ex. 9, Tr. of Yoxheimer* [#65-9] at 4-5, 24-25). Defendant does not explain, however, how this aggressive conduct has any bearing on the severity of the crime at issue, i.e., first degree arson, with which he asserts Mr. Waterhouse could conceivably have been charged. *See* Colo. Rev. Stat. §

18-4-102(1) (defining first degree arson as follows: "A person who knowingly sets fire to, burns, causes to be burned, or by the use of any explosive damages or destroys, or causes to be damaged or destroyed, any building or occupied structure of another without his consent commits first degree arson.").

In response, Plaintiffs assert that Defendant used deadly force "even though Mr. Waterhouse's crimes were limited to misdemeanor property damage and not severe." *Motion* [#71] at 8 (citing *Pl.'s Ex. 5, Computer-Aided Dispatch (CAD)* [#71-5] at 4[20] (stating that Mr. Waterhouse "has not injured or threatened anyone inside with the hammer, did cause property damage" and that "only charges are crim[inal] mis[chief] at this point"); *Pl.'s Ex. 6, Depo. of Hagerman* [#71-6][21] at 36:6-40:25). A nonviolent misdemeanor clearly does not justify deadly force. *See Casey*, 509 F.3d at 1285 (citing *Graham* 490 U.S. at 396). However, the Court notes that evidence cited here by Plaintiffs all refer to circumstances occurring before any smoke or fire was detected. Agent Hagerman's cited testimony concerns what was learned from Ms. Lopez early in the encounter, and the CAD transcript demonstrates that the report of smoke occurred approximately ninety minutes after the statements to which Plaintiffs refer. *Compare CAD* [#71-5] at 4 (time entry of 15:39:26 *with* time entry of 17:17:08).

Starting a fire in a house with people inside is a serious act that can justify a response of deadly force. *See, e.g.*, *Marie Ramirez v. Guadarrama*, 844 F. App'x 710, 714

---

[20]  Page citations refer to the numbering used by the Court's CM/ECF docketing system and not to the document's original numbering.

[21] The Court notes that this exhibit [#71-6] is mis-titled on the text entry portion of the electronic docket as "Agent Williams Deposition." The attached document is, however, the deposition of Agent Hagerman, as referenced by Plaintiffs in their Response [#71].

(5th Cir. 2021) (finding use of deadly force reasonable partly because "the severity of the threatened crime, i.e., felony arson, was considerable"); *see also Robinson v. Sauls*, 521 F. Supp. 3d 1282, 1293 (N.D. Ga. 2021) (observing that individual who pointed a firearm at law enforcement and against whom deadly force was used was being served with "arrest warrants for two violent felonies: attempted arson of his mother's home while she was therein, and aggravated assault with a deadly weapon on two police officers"), *partially rev'd on other grounds*, 46 F.4th 1332 (11th Cir. 2022). Even viewing the facts in a light most favorable to Plaintiffs, officers could have reasonably believed that Mr. Waterhouse committed first degree arson immediately prior to the shooting. The Court therefore concludes that the first *Graham* factor favors finding that Defendant's use of deadly force was objectively reasonable.

As explained above, the severity of a crime on its own is unlikely to be dispositive of whether deadly force is reasonable. Both *Marie Ramirez* and *Robinson* were decided on the basis of the immediacy of the threat to the officers, rather than the severity of arson as a crime. *See Marie Ramirez*, 844 F. App'x at 714 (deadly force reasonable when suspect doused himself in gasoline, then advanced toward officers holding gas can and what appeared to be a lighter); *Robinson*, 521 F. Supp. 3d at 1300 (deadly force reasonable after suspect refused commands to surrender peacefully and pointed gun at officers). The Court therefore proceeds to the second *Graham* factor.

### b.   Immediacy of Threat

The second *Graham* factor addresses whether Mr. Waterhouse posed an immediate threat to the safety of Defendant or others. "[N]ot only is the second factor of singular importance, it also is the most 'fact intensive factor.'" *Est. of Taylor*, 16 F.4th at

763 (quoting *Pauly*, 874 F.3d at 1216); *see also Est. of Valverde*, 967 F.3d at 1061. To evaluate the immediacy and seriousness of a threat facing officers, the Tenth Circuit has set out four nonexclusive factors. *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). These factors include: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Id*.

### i.      Compliance with Commands

Regarding the first *Larsen* factor, the Court considers whether the Agents ordered Mr. Waterhouse to drop a weapon and whether he complied with officer commands. As to the first part of this inquiry, Defendant concedes, solely for purposes of the present Motion [#65], that Mr. Waterhouse was not armed with a weapon when he was shot.[22] *Motion* [#65] at 11 n.2.

As to whether Mr. Waterhouse complied with the Agents' commands, there is no evidence that Defendant commanded Mr. Waterhouse to stop running or that he gave any warning before firing. However, officers are not *required* to give a warning before using deadly force if it is not feasible to do so. *Cordova v. City of Albuquerque*, 816 F.3d 645, 660 (10th Cir. 2016). Given evidence that Mr. Waterhouse ran out of the bedroom

---

[22] The Court notes that both a hammer and a long wooden rod were later mapped by the Critical Incident Response Team (CIRT) on the floor of the basement's living room. *See* [#65-29]. Neither a hammer nor a long wooden rod is noted in the diagram in the bedroom where it is undisputed Mr. Waterhouse had both. Although Defendant has conceded for purposes of the present Motion [#65] that Mr. Waterhouse did not have either of these items in his hands when he exited the bedroom, no alternative explanation has been provided regarding why these items were found on the living room floor rather than in the bedroom.

suddenly and in Defendant's general direction, the situation presents the type of "rapidly evolving circumstances" in which no warning may be necessary before using reasonable force. *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1175 (10th Cir. 2020). However, Defendant cannot have it both ways—if Defendant's failure to give a warning can be excused, Mr. Waterhouse cannot be faulted for failing to heed such a warning if none was given. The mere fact that Mr. Waterhouse may have escalated the situation by failing to comply with the Agents' earlier commands to exit the basement does not focus on the relevant inquiry here, i.e., on whether Mr. Waterhouse complied with police commands in the moments immediately prior to Defendant's use of deadly force. *See, e.g.*, *Larsen*, 511 F.3d at 1260 (suspect "refused to cooperate with the officers' repeated orders to put down the knife"); *Thomson*, 584 F.3d at 1318 ("[Arrestee] was repeatedly told to put down his weapon, but he did not comply with the commands of the officers and instead moved the gun up and down quickly."). However, as discussed in depth in Section III.A.1.b.iv. below, the Court notes that, even taking the evidence in a light favorable to Plaintiffs, Defendant likely had little or no time to utter commands to Mr. Waterhouse as Mr. Waterhouse quickly rushed out of the bedroom and, in so doing, necessarily came toward officers (regardless of what Mr. Waterhouse's ultimate intention was). *See, e.g.*, *Def.'s Ex. 6, Decl. of Cook* [#65-6] ¶ 17 ("I believe there was no time to effectively shout commands at Mr. Waterhouse as he was rushing out of the room because he was just feet from Sgt. Direzza and he was moving very quickly.").

Thus, although Mr. Waterhouse was not ordered to drop a weapon or given any other command by officers in the moments immediately prior to the shooting, the Court finds, in light of the rapidly evolving circumstances, that the first *Larsen* factor weighs only

slightly against finding that Mr. Waterhouse posed an immediate risk of serious physical harm.

### ii.    Hostile Motions with a Weapon

The second *Larsen* factor evaluates whether an individual made hostile motions with a weapon toward officers. Again, Defendant concedes, solely for purposes of the present Motion [#65], that Mr. Waterhouse was not armed with a weapon when he was shot. *Motion* [#65] at 11 n.2.

In many cases where officers resort to deadly force, the suspect is either holding a gun, *see, e.g.*, *Pauly*, 874 F.3d at 1216-17, or appears to reach for one, *see, e.g.*, *Est. of Taylor*, 16 F.4th at 767. When an individual is unarmed or possesses a weapon with less lethal potential, courts evaluate the alleged hostile motions more critically. *See Bond v. City of Tahlequa*, 981 F.3d 808, 820-21 (10th Cir. 2020), *rev'd on other grounds*, 142 S. Ct. 9 (2021) (holding that reasonable jury could find no hostile motion or immediate threat when individual "raise[d] hammer above his head" in a "defensive stance").

The Court agrees that suddenly running toward a police officer likely merits the use of *some* force. *See Smith v. City of Roswell*, No. 15-1004 KG/KRS, 2017 WL 3172726, at *10 (D.N.M. May 25, 2017) (noting that officers were justified in tasing arrestee while he was "charging at the officers with a baton in his hand"). To prevail on this factor, however, Defendant must show that he perceived Mr. Waterhouse as posing a sufficiently grave threat to warrant the use of *deadly* force. *Reavis*, 967 F.3d at 985. The second *Larsen* factor evaluates hostile motions made with a weapon, rather than any hostile behavior, because "deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of

serious physical harm to himself or others." *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009). Defendant concedes that Mr. Waterhouse was unarmed for purposes of the present Motion [#65], so he could not have made any hostile motions toward Defendant with a weapon. Nevertheless, as discussed further in Section III.A.1.b.iv., it is undisputed that Mr. Waterhouse had access to weapons and had previously been holding at least two different weapons. Again, as discussed further below, even taking the evidence in a light favorable to Plaintiffs, Defendant had little or no time to assess conclusively whether Mr. Waterhouse had one or both of those weapons in his hands as Mr. Waterhouse quickly rushed out of the bedroom and necessarily came toward officers.

Thus, although Mr. Waterhouse did not make hostile motions with a weapon, given the rapidly evolving circumstances, the Court finds that the second *Larsen* factor weighs only slightly against finding Mr. Waterhouse posed an immediate threat to Defendant.

### iii. Distance

As for the third *Larsen* factor, Plaintiffs concede that "there was not much distance—perhaps six to ten feet—between Mr. Waterhouse and the officers" when Mr. Waterhouse exited the bedroom. *Response* [#71] at 12. Given this concession, the Court concludes that Mr. Waterhouse was in close proximity to Defendant and Agent Williams at the time Defendant opened fire. Therefore, the Court finds that the third *Larsen* factor weighs heavily in favor of finding that Mr. Waterhouse posed an immediate risk of serious physical harm.

### iv. Manifest Intentions

In evaluating Mr. Waterhouse's manifest intentions under the final *Larsen* factor, the Court looks to whether a reasonable officer would have perceived Mr. Waterhouse's

actions as threatening. *See Est. of Taylor*, 16 F.4th at 770. A suspect's actions may result in "conflicting interpretations" of his intentions, but officers' response to a threat is permissible so long as their assessment of the threat is reasonable. *Bond*, 981 F.3d at 821; *see also Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (explaining that officer's assessment of threat of harm "need not be correct . . . as long as it is reasonable"). Importantly, while deadly force is reasonable when officers face the threat of serious physical harm, that "does not mean that any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death." *Cordova*, 569 F.3d at 1190 (finding deadly force unreasonable when threat faced by officers was "hypothetical" and "disputed," rather than "actual and imminent").

Plaintiffs emphasize Agent Cook's assertion that Mr. Waterhouse appeared to be "just trying to run up the stairs" when he came out of the bedroom. *Response* [#71] at 13 (quoting *Pl.'s Ex. 4, Agent Cook CIRT Interview* [#71-4] at 11; citing *Pl.'s Ex. 3, Depo. of Cook* [#71-3] at 42:7-10). The Court notes, however, that even Agent Cook, on whose testimony Plaintiffs heavily rely, testified that Mr. Waterhouse was moving very quickly when he came out of the bedroom. *See, e.g.*, *Pl.'s Ex. 4, Agent Cook CIRT Interview* [#71-4] at 12 ("that door just whipped open and he came running out"), 13 ("It was quick, uh, within a matter of a second or two, that door was open, um, he wasn't walking, I mean, he was running, very, uh, quick movements."). There is no evidence, for example, that Mr. Waterhouse came out of the bedroom with his hands up or in some other verbal or non-verbal fashion indicated that he was intending to be docile and obedient to officers. In addition, in light of the CIRT diagram of the basement, *see* [#65-29], and the uncontested alteration of the diagram by Defendant showing the position of each officer,

*see* [#61-42], it is indisputable that, regardless of whether Plaintiff was exiting the bedroom to attack Defendant and/or Agent Williams or whether he was intending to essentially do a U-turn to his left to go up the stairs, he *had* to first move out of the bedroom toward Defendant and Agent Williams. It is also undisputed that Mr. Waterhouse had access to, and actually had in his hands at various times, two weapons, a hammer and a long wooden pole. *See* [#75-1] at 2, 6, 11 (Facts #10, #27, #52). He had the long wooden pole in his hands sometime in the minute before he exited the bedroom. *See id.* at 6, 8 (Facts #26, #35). Mr. Waterhouse had been yelling and using aggressive language toward the officers throughout the encounter, including words and phrases like "get some," "come get some," "I want to get hurt," "faggots," "nigger," "mother fucker," "I got something for you," and "shit's gonna fly mother fucker." *Id.* at 3-4 (Fact #11). He had, up to that point in time, been non-compliant with officer requests and orders. *Id.* at 3-4 (Facts #10, 12, 13). Given Mr. Waterhouse's act of quickly running directly toward Defendant when only six-to-ten feet separated them, combined with his earlier erratic behavior and language, the Court finds that a reasonable officer in Defendant's position could conclude that he was at immediate danger of serious physical harm.

Plaintiffs downplay the short amount of time in which Defendant had to think and act, asserting that "[t]his event was not so stressful or rapidly unfolding as to prevent Defendant [from] accurately and rationally perceiving what was going on." *Response* [#71] at 11. In support, they point to Defendant's deposition testimony, wherein he agreed that one goal of training was to make officers "better able to stay calm in high stress situations and rationally perceive events," *Ex. 1, Depo. of Def.* [#71-1] at 203:8-11; he stated that he felt like he was "in control of [his] faculties" and "calm enough to rationally

and accurately perceive what was happening in front of" him, *id.* at 220:18-24; he agreed that, "[i]n order to accurately and rationally perceive what's happening around you, it's important to be aware of what's going on in the room," *id.* at 221:1-4; he agreed that he could see Mr. Waterhouse clearly when he came out of the bedroom, despite the smoke, *id.* at 231:23-232:5; and he agreed that "there was enough time . . . to conclusively determine" whether Mr. Waterhouse was armed, *id.* at 232:12-22. *Response* [#71] at 11. However, Defendant's undisputed testimony further explains that accurately and rationally perceiving what is happening in a given situation does *not* mean that an officer is completely perceiving the situation, i.e., aware of every important piece of information to provide the "full picture" of events, particularly when "you have very tight timeframes, when you have someone who is doing something, they're trying to hurt you in a very close proximity in a very close – very short time frame." *Ex. 1, Depo. of Def.* [#71-1] at 221: 5-22.

Agent Cook, having observed the events occurring in the basement from outside of the building through a window, stated: "I believe there was no time to effectively shout commands at Mr. Waterhouse as he was rushing out of the room because he was just feet from Sgt. Direzza and he was moving very quickly," and "I do not believe Sergeant Direzza had more than a second to decide what to do when Waterhouse charged out of the SE bedroom." *Def.'s Ex. 6, Decl. of Cook* [#65-6] ¶¶ 17-18. In those moments, Agent Cook did not recall seeing anything in Mr. Waterhouse's hands. *Pls.' Ex. 3, Depo. of Cook* [#71-3] at 42:5-6. Agent Williams stated: "I was still thinking this big, long, cylindrical device was possibly on him. I don't know. I didn't see it at this point. But I – that's what I was thinking. I was thinking this man was armed with this deadly weapon of some sort."

*Def.'s Ex. 13, Depo. of Williams* [#65-13] at 47:16-21. Defendant, although conceding for purposes of the Motion [#65] that Mr. Waterhouse did not actually have a weapon in his hands, nevertheless *perceived* that he did. *Def.'s Ex. 10, Depo. of Def.* [#65-10] at 190:14-22.

In addition, Plaintiff has offered no explanation regarding the undisputed facts from the Coroner Report, which shows three critical points. First, there was a "3 x 2.5 cm dried orange-purple abrasion" on Mr. Waterhouse's lower left abdomen from the bean bag impact, as shot by Agent Williams. *Ex. 39, Coroner Report* [#65-39] at 4. Second, the gunshot entry wound was located in the right lower back. *Id.* at 1-3. Third, the gunshot exit wound was located in the left chest. *Id.* at 1, 3. The autopsy photographs support the coroner's written statements. *See Def.'s Ex. 37, Autopsy Abdomen Photo* [#65-37] (showing the impact location of the beanbag on Mr. Waterhouse's lower left abdomen and the bullet exit wound on his left chest); *Def.'s Ex. 38, Autopsy Back Photo* [#65-38] (showing the bullet entry wound on Mr. Waterhouse's right low back). The coroner stated that the trajectory of the bullet through Mr. Waterhouse's torso was "[b]ack to front, up, and right to left." *Ex. 39, Coroner Report* [#65-39] at 1.

The only reasonable explanation offered by either party is Defendant's theory that the non-lethal bean bag shot by Agent Williams hit Mr. Waterhouse in the lower left abdomen, causing Mr. Waterhouse to twist toward his left (which was toward the stairwell) as he fell. *Motion* [#65] at 17 (noting that Agent Cook's observation of seeing Mr. Waterhouse turn left toward the stairwell was consistent with Mr. Waterhouse "responding to the force of being struck with the bean bag in his lower left abdomen") ; *see also Def.'s Ex. 6, Decl. of Cook* [#65-6] ¶ 14 ("I cannot say whether he intentionally turned toward

the stairs or whether he turned because of a bean bag striking him. I am familiar with the effects of a super sock round. The force and pain from a strike from a super sock round could cause a person to turn their body."); *Def.'s Ex. 47, NE Window* [#65-47] (showing the window through which Agent Cook was observing); *Def.'s Ex. 50, Agent Williams' CIRT Interview* [#63, #65-50] at 41:32-42:00). As he was falling, one of Defendant's three bullets, shot over the space of no more than three seconds, hit Mr. Waterhouse in the back. *See* [#75-1] at 13 (Fact #62); *see also Def.'s Ex. 9, Tr. of Yoxheimer* [#65-9] at 22 ("Of this, of this softer, the softer one, which I had thought, I-I suspected to be the less then, and then, um, two or three rounds of the, uh, of the, of the louder gun being used, which I suspect would be a handgun.") ("[I]t probably all took place in probably three seconds, no more than three seconds of the less lethal going off and then the, uh, the lethal going off."). It does not take an expert witness to explain that a bullet shot by Defendant at a *vertical* Mr. Waterhouse running for the stairs would not have traveled from the low back to the mid-chest.

As noted at the outset of this discussion, the Court noted that, in evaluating Mr. Waterhouse's manifest intentions under the final *Larsen* factor, the Court looks to whether a reasonable officer would have perceived Mr. Waterhouse's actions as threatening. *See Est. of Taylor*, 16 F.4th at 770. Mistaken or not, a reasonable officer could have perceived Mr. Waterhouse's actions as threatening given his prior conduct, the likelihood he was impaired by alcohol and methamphetamine, his access to weaponry, the dangerous setting, his quick movement, his proximity to the officers, and his necessary advancement toward officers as he came out of the bedroom. All of this needed to be evaluated with incredible speed to make a split-second decision, given the speed and proximity factors

just mentioned. Therefore, the Court finds that the fourth *Larsen* factor weighs heavily in favor of finding that Mr. Waterhouse posed an immediate risk of serious physical harm.

### v.   Conclusion as to the *Larsen* Factors

The Court finds that two of the four *Larsen* factors weigh slightly against and two weigh heavily in favor of finding that a reasonable officer would perceive that Mr. Waterhouse posed an immediate and serious threat to Defendant and/or others. Accordingly, the Court finds that the second (and most important) *Graham* factor (immediacy of threat) weighs in favor of finding that Defendant's use of deadly force was reasonable.

### c.   Active Resistance or Attempts to Evade Arrest

In this case, the third and final *Graham* factor bears great similarity to the fourth *Larsen* factor discussed above, insofar as it pertains to Mr. Waterhouse's intention to fight or flee. It is undisputed that Mr. Waterhouse undoubtedly resisted and attempted to evade the officers' efforts to apprehend and remove him from the basement, given that he refused to exit the basement and slammed the door to the bedroom shut when the Agents entered the basement. However, it is less clear what precisely was occurring in the moments leading up to the shooting.

As discussed above, Defendant points to evidence that Mr. Waterhouse was actively resisting officers, possibly by intending to use force. On the other hand, Plaintiffs point to evidence that Mr. Waterhouse was simply trying to get out of the burning basement as well, and that as he exited the bedroom, he was turning toward the left to go up the stairs. *Response* [#71] at 15 (citing *Pl.'s Ex. 3, Depo. of Cook* [#71-3] at 42:5-10). Defendant responds by noting that no bullet defects were found in the wall between

the bedroom doorway and the stairwell, as would have occurred if Mr. Waterhouse had been making for the stairs when he was shot, but rather the only bullet defects were found in the bedroom, as would have occurred as he was coming out of the bedroom and directly toward the officers. *Reply* [#75] at 6 (citing *Def.'s Ex. 17, Burned Stairs and Door Opening* [#65-17]; *Def.'s Ex. 18, Fire Damage to SE Bedroom* [#65-18]; *Def.'s Ex. 29, CIRT Basement Diagram* [#65-29]; *Def.'s Ex. 39, Coroner Report* [#65-39]; *Def.'s Ex. 40, Basement Facing Room* [#65-40]; *Def.'s Ex. 41, SE Bedroom Entrance* [#65-41]; *Def.'s Ex. 42, Basement Diagram with Additions* [#65-42]; *Ex. 43, SW Room Doorway* [#65-43]; *Def.'s Ex. 44, Bullet Hole on Chair and Bed* [#65-44]; *Def.'s Ex. 45, Bullet Hole in Bed* [#65-45]; *Def.'s Ex. 46, Defect on Chair* [#65-46]). The Court also notes that it is unclear whether officers were trying to arrest Mr. Waterhouse at all, as opposed to simply extracting him from his sister's house, although a reasonable jury could infer that arrest was likely given the evidence of arson, and there is some evidence that officers had earlier been considering charging Mr. Waterhouse with criminal mischief and/or property crimes once he was extracted from the home. *Response* [#71] at 8 (citing *Pls.' Ex. 5, CAD Report* [#71-5] at 4; *Pls.' Ex. 6, Depo. of Hagerman* [#71-6] 36:6-40:25); *see also* [#75-1] at 3 (Fact #7). There is also a possibility, as urged by Plaintiffs, that Mr. Waterhouse was finally trying to comply with officers' orders to come out of the bedroom and exit the basement, despite the fact that he had refused to do so for well over an hour. *Response* [#71] at 10, 12.

Given this conflicting evidence, and particularly given that it is not clear that officers were definitively attempting to arrest Mr. Waterhouse at all, viewing the evidence in a light

most favorable to Plaintiff, the Court concludes that the third *Graham* factor weighs against the use of force by Defendant.

### d.    Conclusion as to the *Graham* Factors

Although the third *Graham* factor weighs against the use of force by Defendant, the first factor and the critical second *Graham* factor weigh in favor of a finding that Defendant reasonably used deadly force. The Court should only "reluctan[tly] . . . second-guess the split-second decisions of trained officers reacting to difficult situations in the line of duty." *Cordova*, 569 F.3d at 1190. Here, viewing the evidence in a light most favorable to Plaintiffs, the Court finds that Defendant could have reasonably viewed Mr. Waterhouse as possessing the ability to use deadly force against him or others. Thus, the Court concludes that Plaintiffs have not presented adequate evidence to create a genuine issue of material fact that Defendant acted objectively unreasonably by using deadly force against Mr. Waterhouse.

### 2.    Clearly Established Right

However, even assuming arguendo that Defendant violated Mr. Waterhouse's Fourth Amendment rights, the Court finds that Defendant would be entitled to qualified immunity under the second prong of the qualified immunity analysis. The second prong asks the Court to determine whether the constitutional right purportedly violated by Defendant was clearly established. "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Est. of Beauford v. Mesa County, Colorado*, 35 F.4th 1248, 1268 (10th Cir. 2022) (internal brackets, ellipsis, and quotation marks omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). "To establish that the law was clearly established in

this context, the plaintiff must point to Supreme Court or [published] Tenth Circuit precedents [o]n point, or to the clear weight of authority from other circuit courts deciding that the law was as the plaintiff maintains." *Thompson v. Ragland*, 23 F.4th 1252, 1255 (10th Cir. 2022); *George v. Beaver County*, 32 F.4th 1246, 1258 (10th Cir. 2022) (noting that the right must be clearly established "in light of the specific context of the case, not as a broad general proposition") (internal quotation marks and citation omitted). "[E]xisting law must have placed the constitutionality of the [public official's] conduct beyond debate." *Thompson*, 23 F.4th at 1255 (quoting *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted)). However, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id*. at 1255-56 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (brackets and internal quotation marks omitted)).

Here, even viewing the evidence in a light most favorable to Plaintiffs, Mr. Waterhouse had been reported to be on methamphetamine and alcohol, had been non-compliant with officer orders for at least 90 minutes prior, had access to (and had previously been holding) at least two deadly weapons, and had committed a felony by starting a fire underneath the basement stairs of his sister's home. In the moments immediately prior to his death, the basement stairs were on fire, smoke was heavy in the basement, and two officers were in the living room space of the basement when Mr. Waterhouse quickly opened the door and came running out, with no sign of submission, toward the officers. *See, e.g.*, *Def.'s Ex. 13, Depo. of Williams* [#65-13] at 41:9-11 ("Just a figure in all black came crashing out, screaming either, 'Fuck you, or 'Fuck.' The word 'fuck' was used."). Whether he was running toward the officers to attack or to simply come

out of the bedroom to take a U-turn toward the stairs is immaterial given the split-second the officers had to assess the situation, including to determine whether Mr. Waterhouse had a weapon in his hand, and react.

Plaintiffs rely heavily on *Carr v. Castle*, 337 F.3d 1221, 1226-27 (10th Cir. 2003), where the Tenth Circuit Court of Appeals affirmed the denial of qualified immunity to the defendant-officers. *Response* [#71] at 17-18. There, viewing the evidence in a light most favorable to the plaintiff, the decedent had struck his landlord, had struck two officers who were called to the scene thereafter, and had run from the building. *Carr*, 337 F.3d at 1224-25. The officers pursued the decedent, who emerged from a hiding place, moved toward one of the officers, who used OC spray and a baton on him, and then struck the officer before running away again. *Id.* at 1225. Coming to a fence he could not climb, he threw a four-inch piece of concrete which struck one of the officers on his arm, causing bruising. *Id.* The two officers fired eleven shots, all of which entered the decedent's back side. *Id.*

The Court finds the circumstances of this case to be more akin to those in *Blossom v. Yarbrough*, 429 F.3d 963 (10th Cir. 2005), where the granting of qualified immunity was affirmed by the Tenth Circuit, than of *Carr*, where the denial of qualified immunity was affirmed. In *Blossom*, the decedent was "confrontational and aggressive," the officer believed the decedent was "drunk, high and possibly armed" (although it was later determined that he was not armed), the officer knew that there were "civilians nearby," the officer was "alone and in the dark," and he shot the decedent "from a distance of five to seven feet." 429 F.3d at 967-68. The Circuit emphasized that "the evidence indicates uncertainty in the mind of [the officer] as to whether [the decedent] was armed" and that

the decedent was advancing on the officer, distinguishing *Carr* where there was evidence that the officers shot an unarmed man who was not advancing on them. *Id.* at 968.

Here, the Court finds that the law on December 19, 2019, was not clearly established under the circumstances of this case that Defendant committed a constitutional violation. The Court notes that the fact that Mr. Waterhouse was unarmed is not "outcome determinative," nor is the fact that "alternative, less intrusive" means of force may have been available. *Blossom*, 429 F.3d at 968. Viewed in a light most favorable to Plaintiffs, the evidence discussed above demonstrates that a reasonable officer caught in a split-second decision-making situation could have believed that Mr. Waterhouse was armed and dangerous. In cases where the Tenth Circuit has authorized deadly force against an unarmed suspect, the officers using deadly force had ample reason to believe they were at risk of serious bodily harm. *See, e.g.*, *Easter v. Cramer*, 785 F. App'x 602, 608 (10th Cir. 2019) (finding reasonable officer would believe deadly force necessary when, during physical altercation, suspect shoved officer underwater in pond in apparent attempt to drown him); *Blossom*, 429 F.3d at 965 (finding deadly force reasonable when suspect charged much smaller officer at "full speed," ignoring repeated commands to stop and screaming that he was going to take officer's gun). Mr. Waterhouse had been behaving erratically, both Defendant and Agent Williams perceived him as a threat as he came out of the bedroom, and Defendant, who had ordered the other officers including Agent Williams out of the basement, was not aware that he had any backup close on hand. *See* [#75-1] at 9 (Fact #40); *see, e.g.*, *Blossom*, 429 F.3d at 967.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Here, although certainly not dispositive, the Court notes that the two officer witnesses in the moments leading up to Mr. Waterhouse's death agreed that Defendant's actions were reasonable given the circumstances. *See, e.g.*, *Def.'s Ex. 6, Decl. of Cook* [#65-6] ¶ 23 ("I do not believe Sergeant Direzza's conduct was unreasonable under the circumstances."); *Def.'s Ex. 14, Decl. of Williams* [#65-14] ¶ 16 ("I believe Sergeant Direzza's use of deadly force was reasonably necessary and appropriate under the circumstances."). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine applies to protect officials who make "mere mistakes in judgment, whether the mistake is one of fact or one of law." *Butz v. Economou*, 438 U.S. 478, 507 (1978). Here, even if Defendant mistakenly believed that Mr. Waterhouse was armed, mistakenly believed that Mr. Waterhouse was advancing toward the officers to attack them rather than to turn and run up the stairs, and mistakenly believed that he was alone in the basement room, the evidence demonstrates that such mistakes were reasonable, and Defendant is entitled to qualified immunity.

Accordingly, the Motion [#65] is **granted** to the extent Defendant seeks entry of summary judgment in his favor on the Fourth Amendment excessive force claim.

**B.      Colo. Rev. Stat. § 13-21-201 et seq.: Battery Causing Wrongful Death**

Plaintiff Amber Waterhouse asserts a wrongful death claim against Defendant under Colorado law. *Am. Compl.* [#25] ¶¶ 303-12. With entry of judgment in favor of Defendant on the sole remaining federal claim, the Court must determine whether to retain supplemental jurisdiction over the state law claim, as provided in 28 U.S.C. § 1367. *Blagg v. Tech. Grp., Inc.*, 303 F. Supp. 2d 1181, 1187 (D. Colo. 2004). While a court may exercise supplemental jurisdiction over a state law claim if there is otherwise a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3) states that a court may decline to exercise jurisdiction over such a claim if the Court has dismissed all claims over which it has original jurisdiction. *Id.* When § 1367(c)(3) is implicated in the Tenth Circuit, courts are advised to dismiss pendent state law claims "absent compelling reasons to the contrary." *McDonald v. Sch. Dist. No. 1 in the Cnty. of Denver & Colorado*, 83 F. Supp. 3d 1134, 1153 (D. Colo. 2015); *see also United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002) (stating that when all federal claims have been dismissed prior to trial, the court generally should decline to exercise supplemental jurisdiction over pendant state claims). Here, subject matter jurisdiction is based on federal question jurisdiction. *Am. Compl.* [#25] ¶ 13. Further, Plaintiffs do not plead any basis for diversity jurisdiction. The Court thus finds it appropriate to decline jurisdiction over the state law claim in this case.

Accordingly, Plaintiff Amber Waterhouse's wrongful death claim is **dismissed without prejudice**.[23] *See, e.g.*, *Lopez v. Colorado*, No. 19-cv-0684-WJM-MEH, 2020 WL

---

[23] Pursuant to 28 U.S.C. § 1367(d), the limitations period for any supplemental jurisdiction claim is "tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

1074756, at *5 (D. Colo. Mar. 6, 2020) (dismissing state law claim without prejudice when supplemental jurisdiction is declined).

## IV. Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Motion [#65] is **GRANTED**. Summary judgment is **entered** in favor of Defendant on Plaintiff Estate of Jason Waterhouse's Fourth Amendment claim (the sole remaining federal claim), and Plaintiff Amber Waterhouse's wrongful death claim is **dismissed without prejudice**. The Clerk of Court is directed to **CLOSE** this case after entry of judgment.

Dated: October 18, 2023                                    BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge